## Casse M. Lehmann, Appellee, v. Otto W. Lehmann, Appellant.

### Gen. No. 27,102.

1. DIVORCE—*loss of alimony on remarriage as dependent on valid-
ity of second marriage.* An agreement between parties to divorce
proceedings for payment of certain monthly alimony by the hus-
band for the support of the wife, in addition to payments for sup-
port of children, which provided that, in case of remarriage of the
wife, the payments for her support should cease, was intended to
refer to the ceremony or act of marriage as distinguished from
the status or relation thereafter and the marriage of the wife with
another terminated her right to the payments for her own support
though such marriage might be invalid because contracted within
one year from the date of the divorce.

2. DIVORCE—*remarriage in another State in less than year as terminating right to alimony.* Where, following a decree for divorce in this State, the wife became a resident of New York and was married again in New Jersey within a year, in violation of the statutes of this State, and lived with the second husband in New York and elsewhere, the marriage was valid in such States though void here and she must be deemed to have "remarried" within the terms of an agreement whereby payments for her support were to cease if she remarried.

3. DIVORCE—*effect given to construction by parties of agreement for alimony terminating on remarriage.* Where both parties to an alimony agreement during the existence of a second marriage of the wife treated such marriage as terminating payments for her support under the agreement, such construction is entitled to great if not controlling weight and should be followed in a subsequent proceeding by the woman to compel resumption of such payment upon having the second marriage annulled.

4. DIVORCE—*insufficiency of evidence to show agreement for resumption of alimony on annulment of second marriage.* In a proceeding to compel payment of alimony, evidence examined and *held* insufficient to show that complainant was not induced to procure the annulment of her second marriage by a promise of respondent to resume payments of alimony which were stopped in accordance with the original alimony agreement when she contracted such marriage.

5. DIVORCE—*invalidity of agreement to resume alimony payments on condition of annulling of second marriage.* An agreement by a former husband to resume payment of alimony on condition that his former wife would procure an annulment of her subsequent marriage, is contrary to public policy and void.

6. 'DIVORCE—*breach of oral agreement for alimony entered into after decree not contempt.* Breach of a valid oral contract as to the payment of alimony, made long after the divorce decree, cannot be made the basis of a contempt proceeding founded upon that decree.

7. DIVORCE—*solicitor's fees for services rendered after divorce decree denied.* There is no authority in the Divorce Act (Cahill's Ill. St. ch. 40) for the allowance of fees for services of the wife's solicitor rendered after a final and unappealed divorce decree.

Appeal from the Superior Court of Cook county; the Hon. JOSEPH SABATH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1921. Reversed and remanded with directions. Opinion filed June 27, 1922.

**Statement by the Court.** This is an appeal from

a decree of the superior court of Cook county, entered July 25, 1921, wherein the court found that Otto W. Lehmann (hereinafter referred to as respondent) had not paid to Casse M. Lehmann (hereinafter referred to as petitioner) two alimony instalments of $400 each for the months of April and May, 1921, and ordered that he pay her the amount in arrears within a specified time, and also pay her for solicitor's fees the further sum of $1,250.

The prayer of the petition, filed May 17, 1921, upon which the decree is based, was that respondent might be adjudged guilty of contempt of court for failure to pay said instalments, which petitioner claimed were due by virtue of the provisions of a decree of divorce, entered in her favor by said court on April 1, 1915, on the ground of extreme and repeated cruelty, and the provisions contained in certain written agreements entered into between the parties about the same time. Petitioner's bill for divorce was filed February 17, 1915. Respondent appeared by counsel but did not answer the bill and was defaulted. The parties were married on May 20, 1907, at Youngstown, Ohio, and were remarried on December 27, 1912, at Chicago, Illinois. They had one daughter, Casse Virginia Lehmann, who at the time the divorce bill was filed was about four years old. Petitioner also had another daughter, Jean Lehmann, by a former husband, E. E. Lehmann.

In said divorce decree it was recited that the provisions thereof with respect to alimony for the support of petitioner and that of their daughter, Casse Virginia, were made with the consent of both parties. On March 26, 1915, six days *prior* to the entry of said decree, they entered into two written agreements. In one, it was provided that, if a divorce should be granted, respondent would pay petitioner $800 per month, "which said sum shall be in lieu of every liability of every kind and character that may be due

under any and all circumstances" from respondent to petitioner, except as to the education of their daughter, Casse Virginia, and that, in case of the re-marriage" of petitioner "all alimony herein provided for her shall cease, except the sum of $200 per month for the support of said Casse Virginia." In the other agreement it was provided that, in case of the "re-marriage" of petitioner, respondent should pay to her the sum of $200 per month for the support of her other daughter, Jean Lehmann, and, in order that the pur-pose of the parties might be perfectly clear, it was fur-ther provided that, of the $800 per month mentioned in the first agreement, $200 per month was for the sup-port of Jean Lehmann. And it clearly appears from these agreements that, of the $800 per month men-tioned, $400 per month was for petitioner's own sup-port. · The divorce decree followed the agreements, and provided that petitioner during her lifetime should receive "in full of all claims for alimony" from respondent monthly payments of $600, payable on the first day of each month, but that in case peti-tioner "shall remarry, then and from remarriage" said monthly payments "shall be $200 per month *only* for the support" of said daughter, Casse Virginia. The divorce decree also made provision that each of the parties might have the custody of said daughter during certain alternate periods, and further provided that respondent should not be called upon to pay any further sums than the $200 per month for the support of said daughter, except as the same might be incurred by him while she was in his custody, or incurred with his consent for her education. On April 2, 1915, after the divorce decree was entered, the parties entered into a third agreement in which it was provided, inas-much as the first agreement of March 26 had been merged in said decree, that said March 26th agree-ment should remain in full force and effect, notwith-standing the decree. And on April 4, 1915, the par-

ties entered into a fourth agreement, substantially to the same effect. Under said decree and agreements respondent was obligated to pay petitioner during her lifetime for her own support monthly payments of $400 unless she remarried, and, if she did so, he was no longer so obligated.

On June 24, 1915, petitioner, having been divorced from respondent for a period of less than three months, married one George W. Quintard at Newark, New Jersey. She cohabited with him and continued to live with him for a period of about fifteen months at Bayside, Long Island, New York, and at Rangely, in the State of Maine. In August, 1917, she filed a bill in said superior court to annul the Quintard marriage on the ground that it had been contracted within a year after her divorce from respondent, in violation of the Illinois statute. Quintard did not appear, and on October 13, 1917, the court entered a decree by default annulling said marriage. Respondent, after petitioner's marriage to Quintard, ceased making monthly alimony payments to her, believing that he was no longer under any obligation so to do, and she, from the time of the Quintard marriage until after her separation from Quintard, made no demands upon respondent for any such payments. She testified that she understood that when she married Quintard "the $400 for myself ceased." After said annulment decree was entered respondent made monthly payments of $800 per month to her for the benefit of said daughters; and in January, 1919, voluntarily increased those payments to $1,000.

On January 10, 1921, petitioner filed a petition in the superior court asking for a modification of the divorce decree of April 1, 1915, viz.: that the monthly allowance for the daughter, Casse Virginia, be increased from $200 to $1,200 per month. Respondent answered, a hearing was had, and on March 31, 1921, the court entered a decree, ordering that on and after

April 1, 1921, respondent pay on the first day of each
month to petitioner the sum of $650, for the support
and maintenance of said daughter, instead of the $200
per month as provided in the divorce decree. Consid-
ering the sum of $200 per month, which was payable
by respondent for the support of Jean Lehmann, the
effect of this modifying decree was that respondent
was required to pay to petitioner for the support of
the two children the sum of $850 per month. He
thereafter made payments to petitioner of $850 per
month for such support, but did not on the first days
of April and May, 1921, or during said months, pay
the monthly instalments of $400 (aggregating $800)
for *petitioner's* support, which the latter claimed she
was entitled to by virtue of the provisions of the
divorce decree and the written agreements.

On May 17, 1921, petitioner filed the sworn petition
upon which the decree appealed from is based. After
setting forth certain provisions of the divorce decree
and the written agreements she alleged, in substance,
that on June 24, 1915, she "attempted" to enter into
a marriage with said Quintard in New Jersey and
there took part in a "marriage ceremony"; that prior
to the ceremony she had been advised that the same
would constitute a valid marriage in New Jersey al-
though in Illinois it would be a violation of the Illinois
statute, it being performed within one year after the
entry of said divorce decree; that on her bill filed in
the superior court she, on October 13, 1917, procured
the entry of a decree annulling said ceremony of mar-
riage; and that prior to her filing said bill she, on or
about August 20, 1917, entered into a verbal agree-
ment with respondent, whereby, "in consideration of
her beginning appropriate proceedings to bring about
a separation" between her and Quintard, respondent
"agreed to restore to petitioner *all* of the alimony"
provided for in said divorce decree and written agree-
ments. After setting forth the entry of said modify-

ing decree of March 31, 1921, she further alleged, in substance, that the monthly payments due from respondent amounted to $1,250, but that he refused to pay more than $850 per month, and is in default in the amount of $800 for April and May, 1921, and being so in default is guilty of contempt of court; that he withholds said payments on the claim that said Quintard marriage has relieved him from his obligation to pay any alimony for her support; and that his position is untenable because (1) said marriage was not a "remarriage" in law inasmuch as under the Illinois statute it was void, and (2) by entering into said verbal agreement of August 20, 1917, and, after the entry of said annulment decree of October 13, 1917, by resuming payments of alimony as provided in said divorce decree and written agreements, respondent has waived his rights to make any reduction because of said remarriage.

Respondent in his answer alleged, in substance, that said Quintard marriage was a lawful one in the State of New Jersey, where made, and released and discharged respondent from his obligation to pay any alimony thereafter for the support of petitioner; that under the provisions of said divorce decree and written agreements the manifest intention of the parties was that any marriage thereafter entered into by petitioner, even though it should subsequently be annulled or otherwise terminated, should forever release respondent from his obligation to pay alimony for her own support; that the purport of the words "remarry" and "remarriage" covered and included such a marriage as the Quintard marriage in New Jersey; and that such was the practical construction put by the parties themselves on said words, as is evidenced by the fact that, for a period of about fifteen months after said Quintard marriage, respondent did not pay, and petitioner did not demand, any alimony for petitioner's own support. Respondent denied that on Au-

gust 20, 1917, or thereafter, he made any such verbal agreement with petitioner as charged, and alleged, in substance, that such an agreement, if made, would not be binding because of want of a legal consideration and because against public policy, and, in any case, would not give power or authority to a court of equity to enforce the terms of the original divorce decree as to alimony payments to petitioner, the right to which payments she had lost by reason of said remarriage.

There was a hearing on the petition. Both petitioner and respondent testified at length. Documentary evidence was introduced, and there was testimony to the effect that said Quintard marriage was valid in New Jersey, and in all other States of the Union, excepting Illinois. It appeared that petitioner separated from respondent some considerable time before the divorce decree of April 1, 1915, was entered; that prior to the filing of the divorce bill she was well acquainted with Quintard, who lived in New York and from whom she was there receiving attentions; that she swore to the divorce bill in New York City; that after the divorce she returned to that city; that prior to the Quintard marriage she sought legal advice regarding her legal right to marry him before the expiration of one year from the date of said divorce, and she was informed that such marriage within such time would be a legal one in New Jersey and other States, excepting Illinois; that she married Quintard in good faith, believing the marriage to be a legal one; and that she continued in that belief until August, 1917, when she consulted her attorney in Chicago, shortly before she filed the annulment bill, and was then informed that the Quintard marriage could probably be annulled in the Illinois courts.

In the decree appealed from, the court found *inter alia* that the Quintard "ceremony of marriage," while it may have been valid in New Jersey, was void in Illinois and was "no marriage," that petitioner had

not remarried within the meaning of the word "marriage" as used in said divorce decree and written agreements, and that, hence, she had not forfeited her right to the alimony payments provided for her benefit in said decree; that, prior to the filing of said bill of annulment, respondent, for a legal consideration, made an offer to petitioner, to the effect that if she would procure a legal separation from Quintard "he would give her back her alimony under the decree"; that this agreement was made in good faith by the parties and is a valid one and enforceable in this court of chancery; and that petitioner "performed her part of the contract to completion," and respondent upon such performance "at once resumed payments of money in amounts corresponding to the amounts called for under the decree of divorce." The court held that, while respondent contends that these payments were voluntary payments which he was not obliged to make, such payments were made in accordance with said contract, that he fully understood that the terms of said divorce decree were in force and effect, that the clause therein which provided that alimony payments should cease upon petitioner's remarriage was clearly waived by respondent by his making the contract he did make and resuming the payments he did resume, and that he put petitioner "in the same position with reference to the decree of divorce, as to the payments of alimony, that she was in before going through the ceremony with Quintard." The court further found that $1,250 was a reasonable sum for the services rendered by petitioner's counsel in the prosecution of her petition to have respondent adjudged guilty of contempt, although the court was of the opinion that, "inasmuch as the defense made by respondent to the petition * * * raised substantial questions of law and chancery, * * * the contempt by Otto W. Lehman is not a criminal contempt."

FRANCIS W. WALKER, for appellant; FREDERICK J. BERTRAM, of counsel.

BENJAMIN C. BACHRACH, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

It is first contended by counsel for respondent that the decree should be reversed because the marriage of petitioner to Quintard on June 24, 1915, in the State of New Jersey, was a remarrying within the intent and meaning of the words "remarry" and "remarriage" as used in the written agreements of March 26, 1915, and in the divorce decree of April 1, 1915, and such marriage forever relieved respondent from his obligation to pay alimony to petitioner for her own support.

The written agreements and the divorce decree provide in effect that if petitioner remarries her right to receive alimony for her own support shall then cease. The agreements were ratified and confirmed, after the entry of the decree, by the agreements of April 2 and April 4, 1915. We think that said words as so used were intended by the parties to refer to the ceremony or act of marriage as distinguished from the status or relation thereafter. In 26 Cyc. 825, it is said: "In the law 'marriage' may mean either the acts, agreements or ceremony by which two persons enter into wedlock, or their subsequent relation created thereby." Schouler in his work on Marriage, etc., 6th Ed., vol. 1, sec. 12, p. 16, says: "The word 'marriage' signifies, in the first instance, that act by which a man and woman unite for life, with the intent to discharge towards society and one another those duties which result from the relation of husband and wife; the act of union having been once accomplished, the word comes afterwards to denote the relation itself." Again, speaking of the act by which parties unite in

matrimony, he says (sec. 15, p. 20): "To this, the term 'marriage' is most frequently applied." But, even if it be considered that the parties hereto, by the use of said words in the agreements and the divorce decree, intended to refer to the marriage status after the ceremony had been performed, we think it must be held under the undisputed evidence in the present case that petitioner's marriage to Quintard in New Jersey was a valid one in that State, and that their status there was that of a legally married couple, as also in the States of New York and Maine where they successively resided and lived together as husband and wife for a period of about fifteen months after the ceremony. In 12 Corpus Juris, p. 459, sec. 43, it is said: "The validity of a marriage, essential to the production of this status, is governed according to the great weight of authority, not by the law of the domicile of the parties but by the law of the place where the marriage is entered into, and the general rule is that a marriage valid where contracted is valid everywhere, except in cases within prohibited bounds of consanguinity, polygamous marriages, and marriages declared void by statute." In *Reifschneider v. Reifschneider*, 241 Ill. 92, it is decided that the legality of a marriage taking place in a foreign State, when questioned in Illinois, is to be adjudged by the laws of the foreign State. In the present case it appears that petitioner was married to Quintard in New Jersey within three months after the granting of her divorce from respondent in Cook county, Illinois, at which times there was in force in Illinois a statute providing, in substance, that in every case in which a divorce has been granted neither party shall marry again within one year from the time the decree is granted, and that if either of the parties does marry again within such year "said marriage shall be held absolutely void." (Ill. Stat. ch. 40, sec. 1a, Cahill's Ill. St. ch. 40, ¶ 2.) In referring to such a statutory prohibition it is said

in Schouler on Marriage, etc. (6th Ed., 1921, vol. 2, sec. 1930, p. 2062): "There is still considerable conflict and confusion of decision and theory as to the extraterritorial effect of a prohibition on remarriage. It was formerly the general view that such prohibitions had no effect whatever to prohibit marriages made in another jurisdiction, but the courts are gradually taking a less liberal view, and now such marriages, although still upheld where made, are discountenanced in the State of the domicile, especially if the parties went to another State for the purpose of avoiding the prohibition. * * * There are many decisions, however, holding that a State statute prohibiting the remarriage of a divorced person has no extraterritorial effect, so such a marriage celebrated in another State is valid, and that a prohibition on remarriage is only effective in the jurisdiction where the decree is granted and does not invalidate a marriage in another jurisdiction." Counsel for petitioner contends that her pretended marriage to Quintard within a year after her divorce from respondent, being void in Illinois by virtue of said statute, was "no marriage," and that, therefore, respondent was not relieved of his obligation to pay alimony to petitioner for her own support. The case of *Wilson v. Cook,* 256 Ill. 460, is especially relied upon. It appears from the opinion in that case that in November, 1906, Cook obtained a divorce from his wife in Clinton county, Illinois, and in February, 1907, was married in St. Louis, Missouri, to Mary A. Moore, who resided in Madison county, Illinois; that thereafter, until her death in January, 1912, they resided together as husband and wife on certain premises owned by her in Madison county; that the administrator of her estate, Wilson, filed a petition in the probate court to sell the real estate on which they had lived to pay debts, making Cook a defendant and alleging that he claimed to be the husband of the deceased at the time of her death

and was in possession of said real estate, claiming homestead and dower therein; and that said probate court upon the hearing found that Cook was not the husband of the deceased, and was not entitled to homestead and dower, and entered a decree of sale. On appeal the Supreme Court affirmed the action of the trial court. In said opinion (p. 463) the court, after quoting from said Illinois statute and mentioning that Cook's marriage to Mary A. Moore was within one year from the time the divorce was granted, said: "Every State has the power to enact laws which will personally bind its citizens while *sojourning* in a foreign jurisdiction providing such laws profess to so bind them, and to declare that marriages contracted between its citizens in foreign States in disregard of the statutes of the State of their domicile will not be recognized in the courts of the latter State though valid where celebrated." The court quoted at length from an opinion of the Supreme Court of Wisconsin (*Lanham v. Lanham,* 136 Wis. 360), which State has a statute similar to that of Illinois, wherein it is said in part (p. 365): "We hold that when persons domiciled in this State, and who are subject to the provisions of the law leave the State for the purpose of evading those provisions, and go through the ceremony of marriage in another State, and return to their domicile, such pretended marriage is within the provisions of the law and will not be recognized by the courts of this State." We think that the facts of the *Wilson* case are to be distinguished from those of the present case. In the former it appears that Cook and Mary A. Moore, both residents of Illinois, left Illinois, were married in St. Louis, Missouri, and shortly thereafter returned to Illinois, where they resided together as husband and wife until her death. In the present case petitioner ceased being a resident of Illinois after the divorce decree was entered (if not prior thereto) and became a resident of the State of New York, and at

the time of the Quintard marriage both she and Quintard were residents of New York, and continued to be residents of the State, or of the State of Maine, as long as they lived together as wife and husband. Even though it be considered that such marriage was not a valid one *in Illinois,* it was valid in New Jersey, where performed, and also valid in their subsequent successive domiciles, and we think that under all the facts disclosed it should be held, contrary to the finding of the chancellor in the decree appealed from, that she remarried within the meaning of the words contained in said divorce decree of April 1, 1915, and in the written agreement entered into between the parties about that time, and that she thereby elected to forfeit, and did forfeit, her right to receive alimony for her own support thereafter from respondent. As said in *Stillman v. Stillman,* 99 Ill. 196, 202: ''It is her privilege to abandon the provision the decree of the court made for her support under the sanctions of the law, for another provision for maintenance which she would obtain by a second marriage, and when she has done so the law will require her to abide her election.'' Counsel for respondent argue that petitioner's contention (viz., that the Quintard marriage being void *ab initio* in Illinois by virtue of said statute, neither said marriage nor the subsequent cohabitation of the parties thereto amounts to a marriage) leads to the absurd conclusions that petitioner's right to alimony, under the divorce decree and the written agreements, has never been interrupted but existed during the entire period of her cohabitation with Quintard, and that, if she had not seen fit to separate herself from him, she could continue to live with him as his wife and collect alimony from respondent in Illinois on the theory that she had never remarried. There is force in the argument. Furthermore, it appears that after the Quintard marriage and during the entire period of the cohabitation of the parties there-

to, respondent did not pay, and petitioner did not demand, any alimony for petitioner's own support as provided in the divorce decree and the written agreements. Both petitioner and respondent seemingly believed that the former had lost her right to receive such alimony from the latter and they acted accordingly, and thereby themselves practically construed their own agreements as to alimony. Such construction is entitled to great if not controlling weight and should, we think, be followed. (13 Corpus Juris, p. 546, sec. 517; *Sholl Bros. v. Peoria & P. U. Ry. Co.*, 276 Ill. 267.)

It is further contended by respondent's counsel that the alleged oral contract between the parties of August 20, 1917, even if made, could not restore to petititioner the right to receive alimony under the provisions of the divorce decree and the written agreements, which right she had lost by reason of her marriage to Quintard, because (a) the alleged contract is invalid for want of a legal consideration and upon grounds of public policy, and (b) its alleged breach cannot be made the basis of a contempt proceeding. We think there is merit in the contentions.

It appears that shortly prior to the filing of petitioner's annulment bill in August, 1917, she requested respondent to meet her at the office of her attorney in Chicago, which he did, and a conversation was there had between them, not in the presence of said attorney, regarding her proposed legal separation from Quintard. She testified that she told respondent she was going to secure either an annulment of the Quintard marriage or a divorce, and that respondent said that he preferred an annulment. He testified that he offered no suggestions as to which course she should pursue, and that he had nothing to do with her subsequent action in filing the annulment bill. Petitioner further testified on direct examination that at this conversation respondent stated that if she obtained

such annulment he would give her back her "alimony" of $400 per month as specified in the divorce decree of April 1, 1915. She, however, repeatedly stated on cross-examination that what he really said was that he would give her the same amount as he had previously given her before she married Quintard, viz., $800 per month. Respondent testified, in substance, that at this conversation she stated that, living apart from Quintard, she would require more than $400 per month for the support of the two children; that he told her he would give her $800 per month for the support *of the children,* and that nothing was said as to his giving her "alimony" as specified in said divorce decree. After the entry of the annulment decree respondent made monthly payments to petitioner of $800 for the benefit of the two children, which in January, 1919, he voluntarily increased to $1,000 monthly. On January 10, 1921, petitioner filed a petition for a modification of the provisions of said divorce decree, asking that the allowance for the daughter, Casse Virginia, be increased from $200 to $1,200 per month, and the chancellor after a hearing modified the decree so that on April 1, 1921, and monthly thereafter, respondent was *required* to pay for the support and maintenance of said daughter $650. It seems strange that, if such a verbal contract was made between the parties as petitioner testifies was made about August 20, 1917, no mention thereof was made in said petition and no order of the court was requested or made regarding future payments for petitioner's *own* support, as distinguished from that of said daughter. We are unable to say, under all the facts and circumstances in evidence, that the chancellor, in the decree appealed from, was warranted in finding that the parties hereto made such a verbal contract as claimed by petitioner prior to the filing of said annulment bill. We find no evidence that petitioner was induced by respondent to seek to annul the

Quintard marriage or that respondent's alleged promise was the cause of her action. On the contrary there is evidence tending to show that petitioner, prior to the interview of the parties in the office of her attorney, had already decided to take steps to annul said marriage. Even if it be considered that respondent made the verbal promise as alleged, the consideration therefor, viz., that petitioner would take steps to procure a separation from Quintard, is not a legal one, and is opposed to public policy. "If an agreement binds the parties or either of them to do, or if the consideration is to do, something opposed to the public policy of the state or nation, it is illegal and absolutely void, however solemnly made." (13 Corpus Juris, p. 424, sec. 360. ) "If the object of a contract is to divorce man and wife the agreement is against public policy and void." (Id. p. 463, sec. 406.) "If the contract is invalid for want of consideration, a ratification that does not supply the consideration cannot make it binding." (Id. p. 314, sec. 145.) And, even if it be considered that there was a valid verbal contract between the parties, as claimed, and that respondent breached it, such breach, made long after the entry of the divorce decree, cannot, we think, be made the basis of a contempt proceeding founded upon that decree, which provided that respondent might cease making the stipulated alimony payments for petitioner's own support in case she remarried, and which he did cease making upon her remarriage. If, after the alleged verbal contract was made, petitioner had appeared in court to amend or modify the decree in accordance therewith, and had secured such amendment or modification providing for the renewal of the alimony payments, and if, upon respondent's failure to make those payments, she had brought him again into court in a contempt proceeding, the situation might be different. Petitioner, however, never sought to amend

said decree after the time it is claimed said contract was made.

And we are of the opinion that the court erred in ordering that respondent pay to petitioner $1,250 as and for her solicitor's fees. We find no statutory authority in the Divorce Act of this State [Cahill's Ill. St. ch. 40] for the allowance of fees for services of the wife's solicitor rendered after a final and unappealed divorce decree. In 19 Corpus Juris, p. 228, sec. 544, it is said: "In the absence of statutory authorization, it seems that suit money will not be granted in a suit by a divorced woman to enforce a decree of alimony against her former husband." (See also *McQuien v. McQuien,* 61 How. Pr. [N. Y.] 280, 282.) Furthermore, it does not appear to us that it would be just and equitable, under all the facts and circumstances disclosed, to tax respondent for such fees. The facts are much different from those in *Czarra v. Czarra,* 128 Ill. App. 430, cited by petitioner's counsel.

Our conclusion is that the decree of the superior court should be reversed and the cause remanded with directions to dismiss the petition for want of equity, and it is so ordered.

*Reversed and remanded with directions.*

BARNES and MORRILL, JJ., concur.