*In re* MARRIAGE OF LEONARD H. KOLB, Petitioner-Appellee, and SYBYL D. KOLB, Respondent-Appellant.

First District (1st Division)   No. 80-1332

Opinion filed August 31, 1981.

Beermann, Swerdlove, Woloshin, Barezky & Berkson, of Chicago (Miles N. Beermann and Howard A. London, of counsel), for appellant.

Lawrence T. Stanner and Associates, Ltd., of Chicago (Lawrence T. Stanner and Mel Sloan, of counsel), for appellee.

Mr. PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

The present appeal raises the issue of whether the annulment of a second marriage results in the revival or reinstatement of a first husband's obligation to pay monthly installments on an alimony in gross award

pursuant to the terms of a divorce judgment which specifically provided for such payments to terminate upon the wife's death or remarriage. The trial court ruled that the first husband's alimony in gross obligation terminated upon the wife's remarriage and was not changed, altered, affected or reinstated by the annulment. Consequently, it ordered the wife to refund to the first husband all sums received from him as installment payments on the alimony in gross award following her remarriage, denied the wife's petition for a rule to show cause and denied the parties' respective petitions for attorneys fees.

For the following reasons, we affirm in part and reverse and remand in part.

The parties, Leonard H. Kolb (hereinafter petitioner) and Sybyl D. Kolb (hereinafter respondent) were married on June 20, 1965, and divorced on October 20, 1972. The judgment for divorce, rendered under the old divorce act (Ill. Rev. Stat. 1971, ch. 40, par. 1 *et seq.*), incorporated an oral agreement reached by the parties as to the distribution of property and alimony. It provided, *inter alia:*

> "That counter-defendant shall pay unto counter-plaintiff as a lump sum settlement for alimony, past, present and future, the sum of One Hundred and Fifty Thousand ($150,000.00) Dollars, payable as follows: $2,000.00 on the day and date of hearing of this cause, namely, October 12, 1972, and $2,000.00 each and every month thereafter for a period of seventy four consecutive months until the said sum of $150,000.00 has been paid until [*sic*] counter-plaintiff by counter-defendant in full; that said payments shall cease upon the death or remarriage of counter-plaintiff if either event shall occur prior to the payment in full to her of the sum of $150,000.00, as provided herein * * *."

The agreement further provided for waiver of any rights to future alimony and for the petitioner to quitclaim his joint interest in the parties' marital home.

In the early part of August 1978, petitioner initiated post-decree proceedings alleging that respondent's remarriage terminated his obligation to make payments on the alimony in gross award pursuant to the divorce judgment. In this action petitioner sought the refund of $30,000 paid to respondent as alimony in gross after the remarriage and before petitioner became aware of respondent's remarriage, an order that his obligation terminated at the remarriage, and a rule to show cause why respondent should not be cited for contempt for her wilful and contumacious disregard of the judgment for divorce.

At the hearing on these petitions before the court, respondent testified that she was married in Las Vegas on February 12, 1977, to George Geiger, whom she had known for a couple of years. According to

respondent's testimony, Geiger proposed to her only a couple of days before the ceremony took place. Directly after the ceremony a small reception occurred. At the reception, Geiger became involved in a heated argument, walked out of the reception and did not return to the hotel. As a consequence, the marriage was never consummated. Annulment proceedings were initiated by respondent in August 1977 in Nevada. Respondent saw Geiger once while she was still in Las Vegas and did not see him again after returning to Chicago. She did speak to him on the telephone once about the then pending annulment proceedings. At this time he told her that he did not want the annulment. After her marriage to Geiger, respondent still received and cashed petitioner's alimony in gross monthly installment payments.

Petitioner testified that respondent visited his medical office on March 8, 1977, approximately a month after her remarriage, and inquired whether he would be willing to give her one-half of the remaining balance on the alimony in gross award so that she could invest it in some real estate with a friend. He responded that he would have to consult his attorney as to the tax repercussions of such a deal. Petitioner also testified that Ruth Segal, an old friend of his, was in his office on March 8, 1977, and produced office records to substantiate her visit. Segal corroborated petitioner's testimony testifying that she went to petitioner's office on March 8, 1977, to have a cyst on her neck removed. She stated that while she was in petitioner's waiting room on that occasion she saw respondent leave petitioner's office and walk through the reception area. She had no opportunity to talk to respondent on this occasion because respondent walked out of the office. She acknowledged that she had known petitioner for about 25 years and that she and her husband were long-time friends of petitioner's.

Pursuant to this testimony, the court entered an order on December 1, 1978, giving "full force and effect to the Nevada annulment decree" and denying refund of the payments made to respondent after her marriage on the basis that petitioner was still obligated for the balance of the alimony in gross award. Petitioner filed a motion to reconsider the December 1, 1978, order, arguing that the trial court had not considered the issue of whether the Las Vegas marriage was void or voidable. Shortly thereafter respondent filed a second petition for a rule to show cause. In that the first trial judge had retired from the bench, the presiding judge of the domestic relations division of the circuit court of Cook County heard these motions and vacated the December 1, 1978, order, assigning the cause for trial before another judge.

In the subsequent hearing before the trial judge, the same three witnesses who had testified earlier again testified. The testimony of petitioner and Segal closely paralleled their earlier testimony. Respondent

testified as to her marriage and divorce from petitioner and as to her marriage and annulment from Geiger. She also answered questions concerning alleged inconsistencies between the complaint filed in the annulment proceeding, her testimony in that proceeding and her deposition testimony in the present proceeding. The complaint and respondent's testimony in the Nevada annulment proceeding indicated that Geiger failed and refused to consummate the marriage over 12 days while the couple were in Las Vegas and that he also withheld information as to his receiving psychiatric treatment for an emotional problem. Respondent testified that she had been told by Geiger's son subsequent to the marriage of Geiger's mental condition. She also testified that she did not advise petitioner of her remarriage and continued to accept monthly alimony in gross payment checks from him. She reiterated her earlier testimony as to her visit once to petitioner's office either in December 1976 or January 1977 prior to her marriage to Geiger.

On April 15, 1980, the court entered the order appealed from. It found that under the parties' divorce judgment petitioner's alimony obligation would terminate upon respondent's remarriage, that petitioner had married Geiger on February 12, 1977, and that consequently petitioner's alimony obligation terminated such that respondent was not entitled to any further payments and that this result was not altered by the September 5, 1978, annulment of the Geiger-Kolb marriage. The court noted that based on its findings it was unnecessary to rule on whether the annulment was a sham or a fraud. Based on these findings, the trial court declared petitioner's alimony obligation terminated and ordered respondent to repay petitioner $30,000, which sum represented the total of the alimony in gross installment payments paid to respondent by petitioner subsequent to her remarriage. Interest from the date of each payment's receipt was also required. The trial court also dismissed respondent's petition for a rule to show cause and denied the petitions for attorneys fees. Respondent filed a timely appeal from the above order as did respondent's attorneys. Petitioner filed a cross-appeal from the trial court's finding that it was unnecessary to consider whether the annulment was a sham and a fraud.

The respondent admits that the issue of whether her first husband's support obligation terminated upon her remarriage and was not reinstated by its subsequent annulment is governed by a 1922 decision of this court in *Lehmann v. Lehmann* (1922), 225 Ill. App. 513. Respondent, however, would have this court overrule that decision on the basis that it produces unconscionable results and that it conflicts with Illinois public policy. After reviewing the parties' briefs, the cases cited therein and the record on appeal, we decline to depart from the *Lehmann* rationale under the circumstances of this case.

In *Lehmann*, the parties' divorce decree, which incorporated the parties' written settlement agreement, as well as several agreements entered into subsequently by the parties, provided for the husband to pay a total of $800 as support for his wife and daughter and his wife's daughter by a previous marriage. They made clear, however, that the husband's obligation to provide support to the wife in the amount of $400 existed only until she remarried, at which time he would no longer be obligated for her support. Within three months of the entry of the divorce decree, the wife remarried in a ceremony performed in New Jersey, and she cohabited with this second husband for a period of approximately 15 months in the States of New York and Maine. She subsequently filed for an annulment of this marriage in Illinois based on an Illinois statutory provision which, at that time, prohibited marriages contracted within a year after the entry of a divorce decree. The trial court found the New Jersey marriage void in Illinois and, therefore, held that the wife had not remarried under the terms of the divorce decree or written agreements. Hence it concluded that the wife had not forfeited her right to alimony from her first husband. On appeal, however, the court found the New Jersey marriage valid in Illinois in that it had been valid where performed. Consequently, the court held that the first husband's alimony obligation terminated upon the remarriage and was not reinstated upon the entry of the annulment.

In construing the term "remarriage" used in the divorce decree and other agreements, the court explained,

> "We think that said words as so used were intended by the parties to refer to the ceremony or act of marriage as distinguished from the status or relation thereafter." (225 Ill. App. 513, 522.)

The court stressed that the parties themselves had practically revealed their intent as to the meaning of the term "remarriage" in the divorce decree and other agreements where the husband automatically terminated his alimony payments upon the wife's remarriage and she made no demands upon him for such payments until after her annulment. The court also acknowledged that even if the term "remarriage" referred to the parties' marriage status, rather than the performance of the wedding ceremony, the wife and her second husband had lived together as a legally married couple.

■■ We note that the approach followed by the court in *Lehmann* in explaining and ascertaining the intent of the parties in using this term was consistent with more recent decisions of this court. As the court explained in *In re Marriage of Kekstadt* (1980), 85 Ill. App. 3d 952, 954-55, 407 N.E.2d 746,

> "Interpretation of provisions in a divorce decree are governed by the same rules pertaining to the construction of contracts.

(*White v. White* (1978), 62 Ill. App. 3d 375, 378 N.E.2d 1255.) An instrument is ambiguous if its meaning is susceptible of being interpreted in more than one sense. (*Sudler v. Sudler* (1972), 6 Ill. App. 3d 546, 286 N.E.2d 113, *cert. denied* (1976), 429 U.S. 921, 50 L. Ed. 2d 288, 97 S. Ct. 318; *Weber v. Weber* (1979), 77 Ill. App. 3d 383, 396 N.E.2d 43.) Additionally, the main objective in interpreting the provisions of a divorce decree is to 'give effect to the apparent intent of the court.' (*In re Estate of Coleman* (1979), 77 Ill. App. 3d 397, 399, 395 N.E.2d 1209; *Pope v. Pope* (1972), 7 Ill. App. 3d 935, 289 N.E.2d 9.) However, the simple failure of parties to agree on the meaning of the terms does not render the language ambiguous. *Harris v. American General Finance Corp.* (1977), 54 Ill. App. 3d 835, 368 N.E.2d 1099."

Moreover, whether an agreement or divorce decree is ambiguous is a question of law to be determined by the trial court. *In re Marriage of Adams* (1981), 92 Ill. App. 3d 797, 416 N.E.2d 316; *Weber v. Weber* (1979), 77 Ill. App. 3d 383, 396 N.E.2d 43.

■■ We find no ambiguity in the reference to the term "remarriage" in the instant judgment. We believe that the clear meaning of the term is, as the court in *Lehmann* held, the occurrence of the event of the marriage ceremony. Respondent urges that it was the parties' intent that the installment payments for the alimony in gross award would only terminate upon respondent's entering into a marriage from which she would be supported based on the parties' intent that she should not receive support from petitioner and a second husband at the same time. It is undisputed in the record that respondent received no support from Geiger during the duration of the marriage but that, according to her own testimony, Geiger wanted her back as his wife, wanted to stay married to her and did not want the annulment. Accordingly, we can assume he intended to abide by his promise to support her. In light of the fact that we have determined that the divorce judgment is unambiguous, it is unnecessary for us to reach this argument.

However, even were we to find the judgment ambiguous in its use of the term "remarriage," we note that the respondent has failed to cite any factors or elements to show that the parties intended the petitioner's support obligation to terminate on the achievement of a marital status rather than on the occurrence of the event of the ceremony. Respondent argues that it was the intent of the parties that petitioner's support would continue until she had entered into a marriage from which she would be supported. However, it would appear that under respondent's view, if she entered a marriage with someone who could not support her, petitioner would be required to continue his support because this would not constitute a "remarriage" under the terms of the decree.

At oral argument it was noted that respondent would have been willing to give up support from petitioner in exchange for support from Geiger. To accept respondent's argument that the term "remarriage" meant marital status would require distinguishing between a valid marriage which might subsequently end in divorce from a voidable marriage which could be consummated and where the parties could live together for some time and then it could be annulled. We do not think this was the parties' intent. Rather, we agree with the court in *Gaines v. Jacobsen* (1954), 308 N.Y. 218, 224, 124 N.E.2d 290, 293-94, which explained the parties' intent:

> "[T]he understanding must have been that, upon the wife's remarriage, the husband could regard himself as free of the duty to support her. He could then assume new obligations—he could himself remarry, if he were of a mind to, but his means limited—without remaining forever subject to the possibility that his first wife's remarriage would be annulled and the burden of supporting her shifted back to him. And the wife, too, must have understood that by remarrying she abandoned her rights to support under the agreement, for better or for worse, in favor of whatever support would be furnished her by her second mate."

We believe this interpretation is further buttressed by counsel for respondent's acknowledgement during oral argument that this question could have been avoided had the divorce judgment been drafted to specifically provide for the contingency where a second marriage is annulled. Indeed, as *Lehmann* was the only Illinois authority on this issue at the time the parties' oral agreement was reached, it would have been necessary to draft the agreement or divorce judgment to specifically define remarriage as referring to the marital status rather than the ceremony if the parties intended to avoid the *Lehmann* result.

It is also argued that *Lehmann* should be overruled because it represents a mechanistic approach to this issue which could cause great inequities and that a more equitable approach would result if the facts of each case were considered in determining whether the first husband's support obligation should be deemed to have terminated. Respondent relies strongly upon the reasoning of the Iowa Supreme Court in *Peters v. Peters* (Iowa 1974), 214 N.W.2d 151. There the court suggested a two-pronged analysis. Under this analysis a court initially inquires into the intent of the court and presumably the parties where a settlement agreement is incorporated into the divorce judgment using the "termination of alimony upon remarriage provision." If the court's or the parties' intent cannot be gleaned from the face of the document, then the next inquiry should be into the equitable and public policy issues which prevail. The court in *Peters* gave great weight to the trial judge's decision

in the case in that he had granted the parties their divorce and, therefore, entered the judgment of divorce at issue. The trial court noted that its intent in using the word "remarriage" was in contemplation of a valid marriage contract which would provide another source of support for the wife.

■■ While we approve the rationale of *Peters* in considering the equitable considerations apparent in a case where the intent of the court or parties cannot be discerned, we believe that here the parties' intent is clear and therefore it is unnecessary to utilize the second prong of the *Peters* analysis. We think that unless special circumstances exist, the use of the term "remarriage" is intended to refer to a ceremonial marriage rather than a marital status unless the parties specifically indicate otherwise. We note that this definition promotes the sense of justice and equity respondent urges in that it offers a predictable and consistent interpretation of the term "remarriage." We would be more apt to question the meaning of the term where special circumstances exist which require special consideration as where the second marriage was entered into without consent, due for instance to intoxication (*Peters v. Peters* (Iowa 1974), 214 N.W.2d 151), or where the wife is either mentally or physically handicapped.

In the present case, if we were to look solely at equitable considerations rather than intent as respondent urges, it might appear that because respondent entered a voidable marriage with Geiger which was not consummated and received no support from him, and in that petitioner was unaware of the remarriage and consequently did not change his position in reliance on her remarriage, that his support obligations should be reinstated. However, respondent would then have been allowed to choose whether to be supported by her first husband or to continue a voidable marriage and seek support from a second husband. We do not think that that result would be consistent with the intent of the parties.

Respondent next urges that Illinois public policy requires analysis of the equitable considerations in this type of case based on section 304 of the Illinois Marriage and Dissolution of Marriage Act. Section 304 provides for a trial court to decide whether to invalidate a marriage, the new act's term for annulment, retroactively. (Ill. Rev. Stat. 1979, ch. 40, par. 304.) If the court decides not to invalidate the marriage retroactively based on the equities of the case, then a determination as to maintenance, child support and property distribution is proper. The respondent contends that this provision was designed to avoid the harsh results of a mechanical approach to retroactivity and urges that we should apply this same concern in the instant case. While this court is ever concerned with providing justice and equity, we believe that equity is best promoted by a consistent and predictable approach which will be easy for the parties to a

dissolution to understand and act upon. In reaching our holding today, we decline to consider what if any different action we would take if the Geiger-Kolb marriage had been void rather than voidable.

Attorneys for both parties have argued that the trial court erred in denying a hearing on the question of attorneys fees. Section 508(a)(1) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 508(a)(1)) authorizes the award of attorneys fees where it has been demonstrated that the petitioning party is financially unable to pay and the spouse is financially able. To justify an allowance of attorneys fees, the party seeking this relief must show financial inability to pay; financial needs within the context of the couple's prior standard of living; and the ability of the other spouse to pay the attorneys fees. (*In re Marriage of Raidbard* (1980), 87 Ill. App. 3d 158, 408 N.E.2d 1021; *In re Marriage of Rogers* (1980), 86 Ill. App. 3d 904, 408 N.E.2d 448; *Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 400 N.E.2d 56.) Allowance of fees rests in the discretion of the court. (*In re Marriage of Raidbard*; *In re Marriage of Miller* (1980), 84 Ill. App. 3d 931, 405 N.E.2d 1099.) Financial inability exists where payment of fees would strip the individual of a means of support and undermine his or her economic ability. *In re Marriage of Raidbard*; *Donnelley v. Donnelley*.

■■ From our review of the record it appears that there was no evidence concerning the relative financial position of the parties. While there was an offer of proof from respondent's attorney as to the fact that respondent had sold the parties' marital residence for $185,000 and had received $145,000 of the alimony in gross award, there was no evidence as to her financial position at the time of the trial, nor was there more than a passing reference from petitioner's counsel as to petitioner's income ranging somewhere between $200,000 and $300,000 yearly. We do not believe these references were sufficient to allow the trial judge to determine that attorneys fees were unwarranted. Accordingly, we reverse this case on the issue of attorneys fees and remand it to the circuit court of Cook County for a hearing to determine the financial ability of the parties and the determination of the question of attorneys fees.

Affirmed in part, reversed and remanded in part.

GOLDBERG and O'CONNOR, JJ., concur.