547 S.E.2d 888

**Laurie M. JOYE, Respondent,**

v.

**Theron R. YON, Appellant.**

**No. 3335.**

Court of Appeals of South Carolina.

Heard Feb. 6, 2001.

Decided April 23, 2001.

Rehearing Denied July 2, 2001.

---

266

Thomas E. Elliott, Jr., of the Elliott Law Firm, of Columbia, for appellant.

William Y. Rast, Jr., of West Columbia, for respondent.

HEARN, Chief Judge:

This is an appeal from an order reinstating alimony following the annulment of the supported spouse's remarriage. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Laurie Joye and Theron Yon were married on June 20, 1970. They were divorced by order dated October 31, 1996. Pursuant to that divorce decree, Yon was required to pay $750 per month in periodic alimony, plus court costs, through the Lexington County Family Court.[1]

On March 23, 1999, Joye participated in a marriage ceremony with Donald Vance. Yon stopped paying alimony March 25, 1999. However, Joye soon learned that Vance had never obtained a divorce from his prior wife. On May 20, 1999, Joye brought an annulment action against Vance. By order dated September 24, 1999, the family court judge granted her an annulment.[2] Yon was not a party to the annulment action.

On two occasions following the filing of the annulment action, Yon was ruled before the family court to show cause why he should not be held in contempt for nonpayment of alimony. On both occasions, the family court judge held the issue of Yon's alimony obligation in abeyance pending the outcome of the annulment action.

Joye filed the contempt complaint from which this appeal arises on December 9, 1999, seeking to hold Yon in contempt for ceasing his alimony payments. In response, Yon argued his alimony obligation should be terminated because of Joye's

---

1. The divorce decree did not contain any provision concerning remarriage by Joye or the effect of a subsequent annulment on Yon's alimony obligation.

2. The family court judge granting the annulment also issued the order under appeal.

"remarriage" pursuant to S.C.Code Ann. § 20–3–130(B)(1) (Supp.2000).[3]

By order dated February 9, 2000, the family court judge found Yon was "not in Civil Contempt of this Court, and that his refusal to pay alimony was not a willful violation." In this same order, the court reinstated Yon's alimony payments, finding "that no marriage ever existed between the ex-wife [and Vance] on March 23, 1999." Yon was ordered to pay all support arrearages and to continue paying monthly alimony beginning on February 1, 2000. Yon appeals the reinstatement of his alimony obligation.

## DISCUSSION

### I. Survey of Law

No South Carolina case has ever addressed whether the annulment of a subsequent marriage restores the alimony obligation owed by the first spouse. Other jurisdictions have given varying treatment to this issue.

Usually an award of alimony terminates upon the supported spouse's remarriage as contemplated in a divorce decree or as specifically addressed by statute.[4] When a remarriage is annulled, the courts must determine whether a prior alimony obligation should be reinstated. 24A Am.Jur.2d *Divorce & Separation* § 791 (1998). Some jurisdictions reinstate alimony based on whether the second marriage was void *ab initio*

---

3. This subsection reads in part:

    (B) Alimony and separate maintenance and support awards may be granted pendente lite and permanently in such amounts and for periods of time subject to conditions as the court considers just including, but not limited to:

    (1) Periodic alimony to be paid *but terminating on the remarriage of the supported spouse* or upon the death of either spouse (except as secured in subsection (D)) and terminable and modifiable based upon changed circumstances occurring in the future.

    (emphasis added).

4. Jurisdictions with no controlling statute generally apply an analysis comparing the various types of alimony and whether they typically survive express contingencies like the remarriage of the supported spouse. *See* Gary L. Young, Jr., Annotation, *Alimony as Affected by Recipient Spouse's Remarriage in Absence of Controlling Specific Statute*, 47 A.L.R.5th 129 (1997).

or only voidable. *See generally* Ferdinand S. Tinio, Annotation, *Annulment of Later Marriage as Reviving Prior Husband's Obligations Under Alimony Decree or Separation Agreement,* 45 A.L.R.3d 1033 (2000). Other courts have disregarded the distinction between void and voidable marriages. *Id.* at 1036. Generally, courts apply one of three broad theories: (1) the void/voidable approach; (2) the automatic termination approach; and (3) the case by case approach. *See* Carla M. Venhoff, *Divorce or Death, Remarriage & Annulment: The Path Toward Reinstating Financial Obligations from a Previous Marriage,* 37 Brandeis L.J. 435 (1998).

A majority of courts reinstate the alimony obligation upon annulment of the subsequent marriage where the attempted remarriage was void *ab initio* but deny reinstatement if the attempted remarriage was merely voidable.[5] "This result has been justified on the grounds that an annulled marriage, being void from its inception, cannot be given any effect as a remarriage of the dependent spouse." 24A Am. Jur.2d *Divorce and Separation* § 791 (1998). Under this approach, a void marriage is void *ab initio* and by definition, is no marriage at all. *See Reese v. Reese,* 192 So.2d 1, 2 (Fla.1966); *Johnston v. Johnston,* 3 Kan.App.2d 208, 592 P.2d 132, 135 (1979); *Watts v. Watts,* 250 Neb. 38, 547 N.W.2d 466, 470 (1996); *Brewer v. Miller,* 673 S.W.2d 530, 532 (Tenn.Ct. App.1984). "[E]ven if a marriage ceremony takes place, the marriage may nevertheless be declared void *ab initio* if the parties could not validly enter into the status of matrimony." *Broadus v. Broadus,* 361 So.2d 582, 585 (Ala.Civ.App.1978);

---

5. "A void marriage contains a defect deemed by the particular state to be so serious that for public policy reasons the union must be considered never to have taken place." Louanne S. Love, *The Way We Were: Reinstatement of Alimony After Annulment of Spouse's "Remarriage",* 28 J. Fam. L. 289, 290 (1990). "A voidable marriage, on the other hand, contains a defect that, although not serious enough to render the marriage automatically void for public policy reasons, is of such a nature that out of fairness the state will allow the parties to choose whether to ratify the marriage." Love, *supra,* at 290–91. A major difference between a void and a voidable marriage is that the latter is treated as valid until declared otherwise by a court, whereas the former does not require such a judgment. *See DeWall v. Rhoderick,* 258 Iowa 433, 138 N.W.2d 124, 126 (Iowa 1965); *Flaxman v. Flaxman,* 57 N.J. 458, 273 A.2d 567, 569 (1971); *Darling v. Darling,* 44 Ohio App.2d 5, 335 N.E.2d 708, 712 (1975).

*Johnson County Nat'l Bank & Trust Co. v. Bach,* 189 Kan. 291, 369 P.2d 231, 237 (1962). Thus, the supported spouse must *legally* enter into another marriage before she may be deemed remarried. *See Watts,* 547 N.W.2d at 470; *Broadus,* 361 So.2d at 585. The mere ceremony of marriage does not legitimize a void marriage.

By contrast, when a supported spouse enters into a subsequent voidable marriage, the supported spouse's right to alimony from the prior spouse is extinguished. *McConkey v. McConkey,* 216 Va. 106, 215 S.E.2d 640, 641 (1975). The rationale is that the supported spouse has voluntarily accepted the risks of a subsequent marriage and the former spouse should not be held accountable for any "gullibility, mistake or misfortune." *Id.*

A significant minority of courts reject the void/voidable distinction and refuse to reinstate alimony under any circumstances. *Beebe v. Beebe,* 227 Ga. 248, 179 S.E.2d 758, 760 (1971) ("[T]he distinction between so-called void and voidable ceremonial marriages is more imaginary than real, and the relationship, if continued after the disability is removed, becomes valid in either case."); *See generally* Love, *supra,* at 289; Tinio, *supra,* at 1036. This approach affords the payor spouse some certainty concerning support obligations. *See In re Marriage of Kolb,* 99 Ill.App.3d 895, 55 Ill.Dec. 128, 425 N.E.2d 1301, 1306 (1981).[6]

The reasoning is that regardless whether the subsequent marriage is void or voidable, both the supported spouse and the supporting spouse expect the supported spouse's remar-

---

**6.** These courts cite three basic policy considerations for terminating support when the supported spouse remarries or attempts to remarry:

(1) A supporting spouse is entitled to rely on the supported spouse's remarriage ceremony to recommit his or her assets.

(2) Unless the remarriage ceremony is taken as conclusive, any latent grounds for annulment between the remarried spouse and her new husband remain suspended until annulment, preventing the former spouse's alimony obligation from ever being determined with certainty.

(3) Even though both former spouses may be innocent, the more active of the two, [the one whose remarriage is later annulled] should bear the loss.

*Glass v. Glass,* 546 S.W.2d 738, 741 (Mo.Ct.App.1977); *see also Shank v. Shank,* 100 Nev. 695, 691 P.2d 872, 873 (1984).

riage to be valid, and the supporting spouse should be able to rely on that expectation. *Richards v. Richards*, 139 N.J.Super. 207, 353 A.2d 141, 144 (Ch.1976); *Flaxman*, 273 A.2d at 569. The supporting spouse may properly assume that his or her financial obligations to the supported spouse have ceased and reorder his or her own affairs accordingly. *Flaxman*, 273 A.2d at 569; *Chavez v. Chavez*, 82 N.M. 624, 485 P.2d 735, 737 (1971); *Richards*, 353 A.2d at 144 ("Certainly, when a former wife remarries, the divorced husband does not concern himself with any legal distinctions between void and voidable. She has married. He is free.").

The supported spouse has been held to have waived any right to collect alimony from the prior spouse. *Keeney v. Keeney*, 211 La. 585, 30 So.2d 549, 551 (1947); *see Hodges v. Hodges*, 118 Ariz. 572, 578 P.2d 1001, 1005 (Ct.App.1978) ("Upon remarriage, the wife obtains a new source of support."); *Surabian v. Surabian*, 362 Mass. 342, 285 N.E.2d 909, 912 (1972) (Wife "relinquished her right of support under the separation agreement [with her first husband].").  Under principles of fairness, even though both former spouses may be innocent, the more active of the two should bear the loss from the misconduct of a stranger. *Glass*, 546 S.W.2d at 741; *G. v. G.*, 387 A.2d 200, 203 (Del.Fam.Ct.1977).

In these jurisdictions, remarriage is accomplished by the *ceremony* of marriage, regardless of the resulting status of the union. *See In re Marriage of Harris*, 203 Ill.App.3d 241, 148 Ill.Dec. 541, 560 N.E.2d 1138, 1140 (1990) (defining remarriage as the ceremony of marriage as it is found in divorce settlements and under statutory law); *Kolb*, 55 Ill.Dec. 128, 425 N.E.2d at 1305; *Shank*, 691 P.2d at 873 (defining remarriage as the solemnization or ceremony of remarriage, without regard to whether the remarriage is later determined to be void or voidable); *Glass*, 546 S.W.2d at 742; *G.*, 387 A.2d at 204 (stating that performing a marriage ceremony is sufficient even if the marriage is technically invalid).  Thus, when a marriage ceremony occurs, it extinguishes the first husband's alimony obligation. *Fry v. Fry*, 5 Cal.App.3d 169, 85 Cal.Rptr. 126, 127–28 (1970).

Other courts have criticized both the void/voidable approach and the automatic termination approach as inflexible and

272

instead apply a case by case analysis. *See generally* Love, *supra,* at 289; *In re Marriage of Cargill,* 843 P.2d 1335, 1341 (Colo.1993); *Peters v. Peters,* 214 N.W.2d 151, 157 (Iowa 1974). Under this fact-specific method, a court applies its general equitable powers to discern the intent of the parties. *See Ferguson v. Ferguson,* 564 P.2d 1380, 1383 (Utah 1977); *In re Marriage of Williams,* 208 Mont. 252, 677 P.2d 585, 587 (1984); *Peters,* 214 N.W.2d at 157. These jurisdictions have held that although participation in the marriage ceremony is evidence of an election to forgo support, courts should examine each case to determine if there are extraordinary circumstances to warrant the continuation of alimony. *Cargill,* 843 P.2d at 1342; *Keller v. O'Brien,* 425 Mass. 774, 683 N.E.2d 1026, 1028 (1997); *Boren v. Windham,* 425 So.2d 1353, 1355–56 (Miss.1983).

Under this analysis, a marriage ceremony will initially terminate a former spouse's alimony obligation. *Boren,* 425 So.2d at 1355. However, the alimony obligation may be revived depending on the facts of the case. *Id.* An annulment of the subsequent marriage does not automatically restore alimony because alimony should only be reinstated where the interests of justice are served thereby. *See, e.g. Williams,* 677 P.2d at 587; *Peters,* 214 N.W.2d at 156 (holding that first husband had no knowledge of his ex-wife's second marriage until four days before the second marriage was annulled, so he was not inconvenienced and alimony was reinstated); *Heistand v. Heistand,* 384 Mass. 20, 423 N.E.2d 313, 317 (1981) (stating that husband never relied on his wife's brief changed status so alimony was revived). Courts employing this approach have allowed the former spouse to assert equitable defenses against the reinstatement of alimony. *See Glazer v. Silverman,* 354 Mass. 177, 236 N.E.2d 199 (1968) (holding that equitable principles prevent the revival of alimony where it would be inequitable to allow wife to receive support from two husbands).

## II. The Law in South Carolina

Yon argues his periodic alimony obligation automatically terminated when Joye "remarried" Vance pursuant to S.C.Code Ann. § 20–3–130(B)(1) (Supp.2000). Yon argues the need for certainty and fairness should guide this court; there-

fore, he urges us to hold that periodic alimony terminates when an ex-spouse participates in a new marriage ceremony, whether that marriage is valid, voidable, or void. Although we recognize the desirability of certainty and clarity in such an instance, we do not believe the position urged by Yon is consistent with South Carolina law.

Pursuant to section 20–3–130(B)(1), periodic alimony automatically terminates if the supported spouse enters a legally recognized remarriage. Unfortunately, the statute does not define the triggering term. We must therefore construe the legislative intent of this code section.

■■■ Rules of statutory construction need not be applied when a statute's language is plain and unambiguous. *Paschal v. State Election Comm'n,* 317 S.C. 434, 436, 454 S.E.2d 890, 892 (1995). Rather, the terms of the statute should be applied according to their literal meaning. *Id.* at 436, 454 S.E.2d at 892. The cardinal rule of statutory construction is that the court must effectuate the intent of the legislature, and in interpreting a statute, the court must give words their plain and ordinary meaning. *State v. Dickinson,* 339 S.C. 194, 199, 528 S.E.2d 675, 677 (Ct.App.2000). We should give statutory provisions a reasonable construction consistent with the purpose of the statute. *Id.; Jackson v. Charleston County Sch. Dist.,* 316 S.C. 177, 181, 447 S.E.2d 859, 861 (1994).

A "remarriage" is a subsequent marriage. Marriage is commonly defined as either the legal union of a man and woman as husband and wife or simply the act or ceremony uniting a couple in the bonds of marriage. *Black's Law Dictionary* 986–987 (7 [th] ed.1999); IX *Oxford English Dictionary* 400–01 (2d ed.1989) (to "marry" means (1) "to join for life as husband and wife; to constitute as man and wife according to the laws and customs of a nation"; and (2) "to enter into the conjugal or matrimonial state").

■■■ Under South Carolina law, "remarriage" encompasses more than simply the act of participation in a marriage ceremony.[7] A person may be legally married under the

---

7. We note the legislature appears to have recognized the distinction between a "marriage" and a "marriage ceremony" in its adoption of the Uniform Probate Code. Consistent with the public policy favoring

common law of this state without participating in any ceremony. A common law marriage exists if the parties presently intend to enter into a marriage contract. *Barker v. Baker*, 330 S.C. 361, 367, 499 S.E.2d 503, 506 (Ct.App.1998). "Termination of alimony based on the remarriage of the supported spouse includes a finding that the supported spouse has entered into a common law marriage." *Jeanes v. Jeanes*, 255 S.C. 161, 165–68, 177 S.E.2d 537, 539–40 (1970); Roy T. Stuckey & F. Glenn Smith, *Marital Litigation in South Carolina Substantive Law*, 252 (2d ed.1997).

▇▇▇ Most importantly, in South Carolina a void marriage has no legal effect and is viewed as having never existed. "All marriages contracted while either of the parties had a former wife or husband living shall be void." S.C.Code Ann. § 20–1–80 (Supp.2000). A bigamous second marriage is void from its inception, and therefore cannot be ratified and made valid. *Day v. Day*, 216 S.C. 334, 338, 58 S.E.2d 83, 85 (1950); *Johns v. Johns*, 309 S.C. 199, 201, 420 S.E.2d 856, 858 (Ct.App. 1992). In *Day*, the court found a "mere marriage ceremony between a man and a woman, where one of them has a living wife or husband, is not a marriage at all. Such a marriage is absolutely void, and not merely voidable." *Id.* at 338, 58 S.E.2d at 85. In South Carolina, there is no legal distinction between a marriage which is annulled and one terminated by reason of bigamy. *Splawn v. Splawn*, 311 S.C. 423, 425, 429 S.E.2d 805, 806 (1993). Legally, they are both void *ab initio*, from the inception. *Id.*

▇▇▇ Since the mere act of participating in a marriage ceremony cannot transform a void marriage into a viable one, Yon's argument for the automatic termination of alimony upon Joye's participation in a ceremony of remarriage is unavailing. The approach Yon urges is, quite simply, inconsistent with South Carolina jurisprudence.

---

the legitimacy of children, a person born out of wedlock is a child of the mother and also a child of the father if "the natural parents participated in a *marriage ceremony* before or after the birth of the child, even though the attempted marriage is void." S.C.Code Ann. § 62–2–109(2)(i) (Supp.2000) (emphasis added). Likewise, a surviving spouse under the Probate Code does not include "a person who, following a decree of judgment of divorce or annulment obtained by the decedent, participates in a *marriage ceremony* with a third person." S.C.Code Ann. § 62–2–802(b)(2) (1987) (emphasis added).

■ South Carolina's consistent view of marriage as expressed in both its statutes and case law constrains us to adopt the void/voidable approach.[8] While this approach may not permit the interposition of equitable defenses to thwart the reinstatement of alimony, an action to terminate or reduce that alimony obligation due to changed circumstances would be available to the former spouse. *Palmer v. Palmer*, 289 S.C. 216, 218, 345 S.E.2d 746, 748 (Ct.App.1986) (stating that when supported spouse's new relationship changes her financial situation, supporting spouse's alimony obligation may be terminated); *Vance v. Vance*, 287 S.C. 615, 618, 340 S.E.2d 554, 555 (Ct.App.1986) (holding that living with another, whether it is with a live-in lover, relative, or platonic housemate, changes the supported spouse's circumstances and alters her required financial support).

Although we adopt the void/voidable approach, we note that even under the less strict case by case analysis, the family court judge's decision should be affirmed. Here, no significant period of time elapsed between Joye's remarriage and her institution of the annulment action. Yon stopped paying alimony on March 25, 1999, and the annulment decree was issued just six months later on September 24, 1999. There is no indication in the record that Yon changed his financial position in reliance upon Joye's remarriage; in fact, he testified at the contempt hearing that he had the funds available to pay the back alimony.[9]

---

**8.** However, we note that three other states that have historically followed the void/voidable approach have applied a case by case analysis in deciding whether to reinstate alimony after a void subsequent marriage. *Fry*, 85 Cal.Rptr. at 128; *Peters*, 214 N.W.2d at 156; *Richards*, 353 A.2d at 144. While not consistent with South Carolina's historical adherence to the view that a bigamous marriage is void *ab initio*, the case by case analysis is consistent with the broad equitable powers granted to family court judges in this state. *Splawn*, 311 S.C. at 425, 429 S.E.2d at 807; *Peirson v. Calhoun*, 308 S.C. 246, 417 S.E.2d 604 (Ct.App.1992). Prior case law recognizes the propriety of family court judges applying equitable defenses to defeat an otherwise valid claim. *See Hallums v. Hallums*, 296 S.C. 195, 198–99, 371 S.E.2d 525, 527 (1988) (applying the equitable defense of laches to defeat mother's claim for retroactive child support).

**9.** We make no finding as to whether Yon could have challenged the family court's award of all support arrearages because that issue is not before us.

### III. Yon's Participation in the Annulment Action

Yon also argues the court erred in reinstating his alimony obligation because he was not a party to Joye's annulment action. He asserts that he should have been made a party to the annulment action because its outcome directly affected him. We disagree.

Generally, a person must be joined as a party to an action if his absence precludes complete relief among those already parties or his interest in the subject matter is so intertwined that he would not receive complete relief or resolution without his participation. Rule 19(a), SCRCP; *see First Citizens Bank & Trust Co. v. Strable,* 292 S.C. 146, 148, 355 S.E.2d 278, 279 (Ct.App.1987).

Since Yon had no standing to challenge the granting of the annulment, it was not necessary for Joye to include him as a party to the action.[10] Moreover, Yon suffered no prejudice by not being made a party to the action. Under South Carolina law, Joye's marriage to Vance was void *ab initio* and Yon's presence as a party to the action could not have altered the decision to grant the annulment.

For the foregoing reasons, the family court's decision is

**AFFIRMED.**

CURETON and SHULER, JJ., concur.

---

10. We make no finding as to whether Yon could have sought permissive joinder in the annulment action because that issue is not before us.