**In re the MARRIAGE OF Lucia C. CARGILL, f/k/a Lucia C. Rollins, Petitioner,**

**and**

**Donald R. ROLLINS, Respondent.**

**No. 91SC738.**

Supreme Court of Colorado,
En Banc.

Jan. 11, 1993.

**1336**

Frey, Lach, & Michaels, P.C., Susan M. Lach, John P. Frey, Fort Collins, for petitioner.

Wood, Herzog, Osborn & Bloom, P.C., Charles S. Bloom, Jennifer J. Stocker, Fort Collins, for respondent.

Justice MULLARKEY delivered the Opinion of the Court.

The court of appeals in *In re the Marriage of Cargill and Rollins*, 826 P.2d 387 (Colo.App.1991), reversed the judgment of the district court which had reinstated a maintenance award. The court of appeals concluded that the husband's maintenance obligation terminated upon the remarriage of the wife and could not be revived upon the annulment of that marriage. We

granted certiorari and now reverse the court of appeals and remand with directions. We hold that, while an annulment of a marriage does not automatically reinstate a maintenance obligation from a previous marriage as a matter of law, such an obligation may be reinstated, depending on the facts and the equities of the situation.

## I.

Lucia C. Cargill and Donald R. Rollins were married in 1972, and four children were born of the marriage. While Rollins completed medical school, Cargill supported the family. At the time when their marriage was dissolved, Cargill was studying to obtain her Master's and Ph.D. degrees in anthropology.

Cargill and Rollins signed a separation agreement in October 1985 in contemplation of dissolving their thirteen-year marriage. The dissolution court subsequently found that the separation agreement was not unconscionable as to support, maintenance, and property distribution and incorporated the agreement into the dissolution of marriage decree. Under the terms of the agreement, Rollins was required to pay Cargill maintenance for a period of six years.[1] To give Rollins a tax advantage, the payments were attributed completely to maintenance and none to child support.

In August 1988, Lucia Cargill married Stefan Schwaab whom she had known only

---

1. The section of the separation agreement entitled *"Maintenance"* provided in relevant part:
   A. ... The Wife is presently seeking a Master and Ph.D. degree; she anticipates completion of her Masters and Ph.D. in anthropology within approximately three (3) years. The maintenance provisions contained in this Agreement are intended to allow Wife three (3) years to complete her education and to provide an additional three (3) years to advance herself financially in a profession of her choice. Wife fully intends to seek full-time employment at the completion of Ph.D. in anthropology. In negotiating this Agreement, both parties anticipate that Wife will be self-supporting within six (6) years of the date of this Agreement.

   B. Commencing October 5, 1985, and continuing on the 5th day of each and every month thereafter through the month of December, 1987, Husband shall pay to Wife maintenance in the sum of THREE THOUSAND FIVE HUNDRED TWENTY DOLLARS ($3,520) per month. Commencing January 5, 1988, and continuing on the 5th day of each and every month thereafter through the month of September, 1991, Husband shall pay to the Wife as maintenance the sum of TWO THOUSAND SEVEN HUNDRED TWENTY DOLLARS ($2,720) per month. Maintenance shall terminate on the death or remarriage of the Wife.

seven weeks.[2] Schwaab represented to Cargill that he wanted to have children, had an income of $37,000 to $39,000 per year, and that he would be able to help support Cargill's children. Instead, Schwaab began to drain Cargill's resources, borrowing $5,000 per month from credit cards and bank credit lines, and refusing to take a job. His behavior was violent, immature and emotionally unstable. They cohabited as husband and wife for about four months and were separated in March 1989, when Cargill petitioned to have the marriage annulled. This marriage was annulled on December 7, 1989 for fraud going to the essence of the marriage.[3] Shortly thereafter, Schwaab declared bankruptcy, leaving Cargill with $120,000 of debt, mostly accrued during their "marriage," and including $21,000 in debt that Cargill was forced to accept when she sold her (second) house[4] without being able to pay off the second mortgage on the house, and $20,000 in student loans. At the time of the trial court's decision restoring her maintenance, she was teetering on the edge of bankruptcy. In contrast, Rollins' expected income for 1990 was in excess of $200,000. Cargill's plans to finish studying for her Master's and Ph.D. degrees had been sidetracked because of the litigation, her financial difficulties and the resulting stress.

Rollins was allowed to challenge the annulment of the Cargill–Schwaab marriage when Cargill sought restoration of maintenance. Considering all the evidence, the district court found that Schwaab had lied to Cargill about his income, debts, and financial prospects, and that, once they were married, he rapidly depleted her financial resources. The court concluded that the annulment proceeding was not collusive, that Cargill's marriage to Schwaab was void pursuant to Colorado law, and that this finding was binding on Rollins.

The trial court further held that the reinstatement of maintenance was appropriate. At the hearing to determine whether maintenance should be reinstated, Cargill testified that she and Rollins intended to split the assets of the marriage evenly and each took approximately $20,000 in debt from the marriage. Child care also was to be handled equally by the two parents. Cargill testified that the amount of maintenance fixed in the separation agreement, $3,520 per month for twenty seven months and $2,720 per month for thirty five additional months, was designed to allow each separate household to have roughly equivalent lifestyles based on Rollins' 1985 estimated salary of $91,000. Rollins had completed medical school and established a substantial ability to earn income during the thirteen-year marriage. His earning ability far exceeded that of Cargill who was a student with no income at the time of the dissolution decree. Since the marriage was dissolved, Rollins' income has risen substantially, while Cargill is still seeking her Ph.D. in cultural anthropology. Her net worth has declined and her assets

---

**2.** Cargill testified that she married Schwaab because she was under a great deal of emotional distress, was lonely, and then being 40 years old, wanted to have another child.

**3.** Although Cargill and Schwaab entered into a property settlement and Cargill waived any maintenance from him, it appears clear that the marriage was of such short duration that she probably would not have been entitled to maintenance and, given his financial circumstances, any maintenance obligation on the part of Schwaab likely would have been only a paper one. Cargill and Schwaab evenly divided approximately $91,000 of debt, most of it credit card debt.

**4.** Cargill was supposed to sell the family home which she and Rollins had purchased and to take the estimated $15,000 or more in equity in that home as part of the financial settlement. She was unable to sell this home, and deeded the home over to Rollins to avoid foreclosure. Rollins eventually sold the home at a loss of $11,000. While waiting for the family home to be sold, Cargill purchased another house, and had the builder take a second mortgage on that house, to be paid out of the proceeds of the sale of the family home. Because the home did not sell, she ended up with two mortgage payments totalling more than $1,600 per month on a $117,000 home.

have been substantially depleted.[5] Essentially, the court found that maintenance was appropriate at the time of the dissolution of the marriage of Cargill and Rollins, and the changes of circumstance simply made the case for maintenance more compelling. The court also ordered that reinstatement of maintenance should be retroactive to August 1988, when Cargill married Schwaab, but subsequently stayed the payment of the retroactive maintenance. The court of appeals reversed the trial court.

## II.

We granted certiorari to determine whether the court of appeals correctly held that, as a matter of law, annulment of a woman's second marriage could not reinstate maintenance payable to the woman by her first husband. We disagree with the court of appeals' disposition of this case for several reasons.

First, the court of appeals was mistaken in its conclusion that the term "remarriage" is unambiguous and that its plain meaning is a ceremonial remarriage, not the status of being remarried. Second, we conclude that, while an invalidated second marriage may serve to reinstate a payor spouse's maintenance obligation from the first marriage, such a reinstatement does not occur automatically as a matter of law but must be based on the particular facts and equities of the case. Accordingly, we reverse the court of appeals.

## A.

■ The court of appeals found that the word "remarriage" as used in section 14–10–122(2) is unambiguous and that the plain meaning of the term is a ceremonial marriage. This conclusion is unfounded

and creates a tension with the law in this state concerning common-law marriage.

The dictionary defines remarriage as having two meanings: "an act or instance of remarrying; the state of being remarried." *Webster's Third New International Dictionary* 1919 (1986). Neither definition is preferred. *See also Black's Law Dictionary* 876 (5th ed. 1979) ("marriage" defined as both status and ceremony). In light of this authority, we find it difficult to understand how the court of appeals could conclude that the plain meaning of "remarriage" is only one of these two complementary meanings of the term.

The primary function of a court in interpreting and construing statutes is to ascertain and to give effect to the intent of the General Assembly, choosing a construction that serves the purpose of the legislative scheme. *Farmers Group v. Williams*, 805 P.2d 419, 422 (Colo.1991) (quoting *Colorado Dep't of Social Serv.'s v. Board of Comm'rs*, 697 P.2d 1, 18 (Colo.1985)). In 1971, Colorado adopted the Uniform Marriage and Divorce Act, sections 14–2–101 to –113 and 14–10–101 to –133, 6B C.R.S. (1987 and 1992 Supp.), substantially based on the Uniform Act as approved by the National Commissioners on Uniform State Laws in 1970. *See* Unif. Marriage and Divorce Act, 9A U.L.A. (1987 & 1992 Supp.). Section 14–10–104 provides that the Act should be applied so as to make the laws of the states which adopt the Act uniform.

While we generally agree that uniform statutes should be construed to bring uniformity to the law in the various states adopting them, there are other factors to consider. First of all, the Uniform Marriage and Divorce Act has been adopted, in whole or (mostly) in part by only seven other states.[6] The vast dissimilarities be-

---

5. In addition, at the time of the dissolution of marriage, two of their four children had their permanent residence with Cargill, and two with Rollins. When Cargill sought reinstatement of maintenance, three children were living with

her, and Rollins was exercising his visitation rights only rarely.

6. These states are: Arizona, Illinois, Kentucky, Minnesota, Missouri, Montana, and Washing-

tween the version adopted by the General Assembly and those adopted by the other seven states make it difficult to construe the act uniformly. Second, Colorado, unlike all of the other states adopting the Uniform Act except Montana, recognizes common-law marriage.[7] Finally, other jurisdictions have not construed the Uniform Act uniformly, so there are disparate constructions placed on the provisions of the uniform act which we are called upon to construe. *Compare In re Marriage of Williams*, 208 Mont. 252, 677 P.2d 585 (1984) (maintenance obligation neither automatically terminated nor automatically reinstated when remarriage annulled) *with In re Marriage of Harris*, 203 Ill.App.3d 241, 148 Ill.Dec. 541, 560 N.E.2d 1138 (1990) (remarriage ceremony terminates maintenance obligation, notwithstanding annulment of remarriage).

The plain language of section 14–10–122 provides that maintenance obligations terminate upon "remarriage" but the statute does not define "remarriage." After reviewing the law regarding marriage in Colorado, the changing purposes served by the payment of alimony and maintenance, and case law from other jurisdictions, we conclude that the legislature intended "remarriage" to mean the status of remarriage.

First, the definition of remarriage must take into account the fact that common law marriage is recognized in the State of Colorado. A common law marriage does not require any kind of ceremony at all but only the agreement of the parties, followed by the mutual and open assumption of a marital relationship. *People v. Lucero*, 747 P.2d 660, 663 (Colo.1987). If remarriage were interpreted to mean the ceremony of

marriage, a subsequent common law marriage would not terminate maintenance under the statute. Given that Colorado law does not differentiate between a nonceremonial common law marriage and a ceremonial marriage, we cannot conclude that the legislature intended the statutory term "remarriage" to cover only one of the two forms of marriage.

If, however, the status of marriage defines remarriage, then a former spouse's maintenance obligation is terminated by an existing valid marriage regardless of whether the later marriage was created by ceremony or by operation of the common law. *See In re Marriage of Dwyer*, 825 P.2d 1018 (Colo.App.1991) (cohabitation, without allegation or proof of common-law marriage, is not "remarriage" under § 14–10–122(2)). *See also In re the Marriage of Harris*, 203 Ill.App.3d 241, 148 Ill.Dec. 541, 546–47, 560 N.E.2d 1138, 1143–44 (1990) (Buckley, P.J., dissenting) (Illinois does not recognize common law marriages, but has amended its analog of 14–10–122(2) to also terminate maintenance if party receiving maintenance cohabits with another on a resident, continuing conjugal basis, which evidences a legislative intent to look to marital status, not ceremony). Thus, interpreting remarriage as the status of marriage encompasses common law as well as ceremonial marriage.

Second, reliance on the status of marriage better complies with the changed purpose of maintenance obligations in Colorado. Prior to July 1, 1958, spousal support was called alimony, and alimony was payable only to the wife.[8] 1953 C.R.S. § 46–1–5. *See* 1963 C.R.S. § 46–1–11. Alimony arose in the English ecclesiastical courts at

---

ton. Each adopted its version of the Uniform Act prior to 1978.

**7.** In fact, of all the cases relied upon by the court of appeals, only *Dodd v. Dodd*, 210 Kan. 50, 499 P.2d 518 (Kan.1972), is from a state fully recognizing common-law marriage, and the *Dodd* court focused its efforts on the void-versus-voidable marriage distinction which is not applicable under the law of Colorado.

**8.** Similarly, prior to the adoption of the Uniform Dissolution of Marriage Act, divorce in Colorado was available only for a limited number of reasons: impotency, bigamy, adultery, wilful desertion, physical or mental cruelty, nonsupport by the husband, habitual drunkenness or drug addiction, conviction for a felony, adjudication of insanity, or (after 1958) living separate and apart for three years. 1953 C.R.S. § 46–1–1 and 1963 C.R.S. § 46–1–1.

a time when divorce was not permitted and a married couple could obtain only a legal separation. Because it was incident to a separation, alimony originally "was a continuation of the husband's (and only the husband's) legal duty of support, a duty that was not discharged because the marriage had not terminated." June Carbone, *Economics, Feminism, and the Reinvention of Alimony: A Reply to Ira Ellman*, 43 Vanderbilt L.Rev. 1463, 1464 n. 4 (1990). *See also* 2 Homer H. Clark, *The Law of Domestic Relations in the United States* § 17.1 at 220–21 (2d ed. 1987). "Where the wife was at fault [for the judicial separation], she was entitled to no alimony." 2 Homer C. Clark, § 17.1 at 221. The original alimony concepts carried over to modern American divorce laws. Divorce, as it was recognized by courts in this country, was initially wholly fault-based,[9] 1963 C.R.S. § 46–1–1(1)(a)–(i), and so a woman could collect alimony from her ex-husband only if he was found to be at fault for the divorce.

With the enactment of no-fault divorce laws in practically every jurisdiction in the Union and the entry of more than half of all single, married, and divorced women into the work force,[10] a new pattern has emerged, with alimony or maintenance being awarded in only a minority of divorces. In the vast majority of such cases, the maintenance award is made against the husband and in favor of the wife. As of Spring 1988, only 16.8 per cent of all ever-divorced or currently separated women had agreed to or were awarded alimony or maintenance payments. U.S. Dep't of Commerce, Bureau of Census, No. 167, *Child Support and Alimony: 1987*, at 8 (1990). *See also* Louanne S. Love, Note, *The Way We Were: Reinstatement of Alimony After Annulment of Spouse's "Remarriage"* [hereinafter *Reinstatement of Alimony* ], 28 J.Fam.L. 289, 300 (1989–90) (citing Census Bureau Report stating that only 15 per cent of the 17 million ever divorced or currently separated women as of 1982 were awarded alimony or maintenance payments).

In Colorado, maintenance is not awarded to either spouse as a matter of right. It is awardable only if the court finds that the spouse seeking maintenance lacks sufficient property to provide for his or her reasonable needs and is unable to support himself or herself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home. § 14–10–114(1)(a), (b), 6B C.R.S. (1987).

In the present case, the purpose of the maintenance payments was to allow Cargill to finish her education and to establish herself in her profession. Because she was not working at the time of the dissolution of marriage and she had helped support the family as Rollins completed his education, Cargill both earned and had a present need for maintenance from Rollins. Her attempted remarriage diminished neither her need for support nor the investment she had made in Rollins' career. *See* Love, *Reinstatement of Alimony* at 300. The public policy which provides an obligation for a spouse to support the other spouse after divorce when there is the need for support on one side, and the ability to pay on the other, should apply to provide for the reinstatement of alimony after a declaration of invalidity of a subsequent marriage where the equitable considerations so dictate. *Id.*

Third, we are not convinced by the reasoning of the cases from other jurisdictions relied upon by the court of appeals. *See In*

---

9. Such was the law in Colorado until 1958, when the General Assembly allowed couples to divorce solely for the reason that they had been living separate and apart by force of decree of a court of record for three consecutive years prior to the commencement of an action for divorce. 1963 C.R.S. § 46–1–1(1)(j).

10. 2 Homer C. Clark, § 17.1 at 223, n. 21 (citing *The Statistical Abstract of the United States* 399 (1985)).

*re Marriage of Harris,* 203 Ill.App.3d 241, 148 Ill.Dec. 541, 560 N.E.2d 1138 (1990); *In re Marriage of Kolb,* 99 Ill.App.3d 895, 55 Ill.Dec. 128, 425 N.E.2d 1301 (1981); *Glass v. Glass,* 546 S.W.2d 738 (Mo.App.1977); *Dodd v. Dodd,* 210 Kan. 50, 499 P.2d 518 (1972); *Sefton v. Sefton,* 45 Cal.2d 872, 291 P.2d 439 (1955); *Gaines v. Jacobsen,* 308 N.Y. 218, 124 N.E.2d 290 (1954); *Lehmann v. Lehmann,* 225 Ill.App. 513 (1922). We find this precedent to be unconvincing, because these opinions are based upon antiquated legal conceptions about gender roles in marriage or upon other unwarranted assumptions. *See* Love, *Reinstatement of Alimony* at 299–300.

In *Gaines v. Jacobsen,* 124 N.E.2d 290, for example, the court relied upon a statute which provided for support from the husband of an annulled marriage, "as justice requires" in holding that an annulled marriage terminates a duty of the first ex-husband to pay alimony.[11] The court reasoned that this statute changed the common law of New York, because prior to the enactment of the statute, "such a marriage [which could be annulled] created no subsequent *duty* of support." (emphasis added). *Id.* 124 N.E.2d at 293. The New York case is distinguishable for two reasons. First, there is no duty of post-marriage support running to either spouse in Colorado under present law. Second, it appears that the New York court assumed that in all cases a husband of an annulled marriage would have such a duty to pay support to his wife from that marriage. While this assumption may be true in New York, Colorado law is to the contrary.

In *Sefton v. Sefton,* 45 Cal.2d 872, 291 P.2d 439 (1955), the court also refused to reinstate alimony to a woman who had remarried but subsequently that marriage was annulled. The court's holding there was based upon the rights of a third-party, the ex-husband who had a duty to pay alimony. First, the court noted that the ex-husband could not be a party to the action in which his ex-wife sought an annulment. *Id.* 291 P.2d at 441. Second, the court noted that while the ex-wife could know of a reason to seek an annulment from her second husband, but never seek such redress, the ex-husband may not have such knowledge, and would be unable to recommit his assets elsewhere. *Id.* 291 P.2d at 442. Third, the court stated that the law looks less favorably, between two innocent parties, upon the more active of those two when a loss is sustained by the actions of a third party. *Id.*

None of these reasons is compelling. First, the district court, in a hearing on a petition for reinstatement of maintenance, can and should determine whether the annulment is binding against the payor spouse.[12] The district court did so in this case. Second, under section 14–10–111(2), 6B C.R.S. (1987), unless the invalidated marriage was bigamous, incestuous, or otherwise void where entered into, there are strict statutory time limits on when a party must seek a declaration of invalidity.[13] Under our statutory scheme, there need not

11. As an example of an "antiquated legal conception of gender roles in marriage or ... [some] other unwarranted assumption[ ]," the *Gaines* court noted that a man, in reliance of his ex-wife's remarriage, could assume new obligations, including remarrying, "if he were of a mind to," *id.,* 124 N.E.2d at 293, despite the fact that, in the case before the court, the ex-husband had remarried three months after the divorce had become final and *five years before* his ex-wife remarried.

12. The court should examine whether the annulment was collusive and whether the facts are sufficient to find that, as between the spouses from the first marriage, there were just grounds to annul the second marriage. The court has discretion to find, upon sufficient facts, that the annulment was used, for whatever reason, as a substitute for a dissolution of marriage. *See* Unif. Marriage and Divorce Act § 208(e) comment, 9A U.L.A. 172 (1987) ("Subsection (e) authorizes the court to treat declarations of invalidity as what they have in fact become—substitutes for divorce.").

13. For example, a person must seek to have a marriage declared invalid within six months after obtaining knowledge that there was fraud going to the essence of the marriage. § 14–10–111(2)(a).

be great concern that one party will sit on his or her right to seek an annulment. We also are not warranted in assuming without proof that a payor spouse will be prejudiced because he or she has recommitted his or her assets after the ex-spouse is remarried. Third, although the law may not favor the more active of two equally innocent parties, equity operates to prevent an injustice, not to perpetrate one. *Conrad v. Scott,* 86 Colo. 115, 121, 278 P. 798, 800 (1929). The law would perpetrate such an injustice if it did not allow someone like Cargill to seek reinstatement of maintenance from Rollins. Through no fault of her own, Cargill was defrauded into marrying Schwaab and into believing that she was surrendering her right to receive maintenance from her ex-husband.

Because of this state's recognition of common law marriages, the purposes behind the payment of maintenance to an ex-spouse, and our view that the cases relied upon by the court of appeals do not conform to the public policies of this state, we conclude that the term "remarriage," as used in section 14–10–122(2) must be construed to mean marital status, and not the ceremony of remarriage.

### B.

██ We do not hold today that maintenance is automatically reinstated when the recipient spouse's subsequent marriage is declared invalid. Such a disposition would be too rigid and could serve to prejudice payor spouses who have relied to their detriment on the belief that their maintenance obligation is terminated. However, the court of appeals' disposition is unnecessarily harsh as well. The solution which the district court used, and which we endorse today, is an equitable middle path. *See In re Marriage of Williams,* 677 P.2d 585; *Ferguson v. Ferguson,* 564 P.2d 1380 (Utah 1977); *Peters v. Peters,* 214 N.W.2d 151 (Iowa 1974).

Section 14–10–111, regarding declarations of invalidity, differs from section 208

of the Uniform Act in that section 14–10–111 does not give the court presiding over the annulment proceeding the option of making the annulment prospective only, if such is in the interests of justice. We find this fact to be immaterial, and that, if it were relevant, it would not be to Rollins' benefit. If we were to take the language of section 14–10–111(5) literally, we would be forced to conclude that, upon the annulment of a marriage of a spouse awarded maintenance from a previous marriage, that maintenance obligation would be revived, and would relate back to the date of the remarriage, as a matter of law. This is because the plain language of the statute provides that the remarriage is invalid, *i.e.,* without binding force or legal efficacy, *Black's Law Dictionary* 739 (5th ed. 1979), as of the date of the remarriage. Not only would such automatic retroactivity be unfair to the person whose obligation to pay maintenance would be revived by an annulment, it also would raise serious due process concerns.

Deeming an invalid marriage as void *ab initio* for all purposes would be unfair to one who is obligated to pay maintenance. Automatic reinstatement of maintenance could encourage all manner of unsavory practices by those who believe it advantageous to have a marriage declared invalid rather than dissolved. However, in the case before us, Cargill has proven to a district court judge in two different proceedings that her marriage to Schwaab was induced by fraud. Furthermore, Rollins has not shown that reinstatement of maintenance retroactive to when Cargill married Schwaab would be prejudicial. Instead, in the case before us, the result reached by the district court was the only equitable one.

The General Assembly's omission of the "prospective only" provision from section 14–10–111 is irrelevant for our purposes. From the due process or fairness perspective of the former spouse, it makes no difference whether or not the annulment court has an option to declare the annul-

ment prospective only. In either case, the former spouse, the person whose obligation to pay maintenance is sought to be reinstated, is not a party to the annulment proceeding and his interests are not represented. In the present case, however, as in Iowa and Montana, the court which hears the proceeding to reinstate maintenance, in which the person whose obligation to pay is in question is a party, must decide whether the annulment is to be binding against that party. It may find that the annulment is not binding on the former spouse if, for example, the annulment was collusive or otherwise defective. Furthermore, the court hearing the reinstatement proceeding must find that it would be fair to the spouse who had the obligation to pay maintenance to reinstate the obligation. Such a proceeding is neither expressly allowed nor prohibited by the Uniform Act. It is, however, in keeping with the role of the district court hearing domestic relations matters as a court of equity.

Manageable standards for a trial court to consider can be formulated. First, the mere fact that a party remarried, and later had that second marriage declared void, does not resurrect the ex-spouse's maintenance obligation.[14] Instead, the trial court must look to the facts of the particular case. Among the factors to be considered are the length of the second marriage, whether the annulment of the second marriage was proper and should bind the first spouse, whether maintenance is being paid (or is more than theoretically payable) from the invalidated marriage, the circumstances of the parties, and whether the payor spouse would suffer substantial prejudice

by reinstating maintenance payments. *See Peters*, 214 N.W.2d 151; *In re Marriage of Williams*, 677 P.2d 585; Love, *Reinstatement of Alimony*. In sum, the district court should be guided by its role as a court of equity in such matters.

■ Here, the second marriage was very brief and, as counsel for Cargill stated in oral argument, Cargill very likely would not have qualified, under section 14–10–114, for maintenance from Schwaab. The facts also show that neither Cargill nor Schwaab was in a financial position to pay maintenance to the other. The trial court also found, after hearing testimony from Cargill, that Cargill's marriage to Schwaab was annullable. Finally, the facts show that Cargill is in a much worse position than prior to the dissolution of her first marriage while Rollins is in a much better position. Although Rollins may be inconvenienced by having to pay maintenance including retroactive maintenance to Cargill, he has not shown that he would be prejudiced by reinstating this obligation.[15] To the contrary, failing to reinstate maintenance would be a windfall to Rollins. In the separation agreement, he agreed to pay six years' worth of maintenance and that is all he has been ordered to pay. Because the facts and the equities in this case weigh so heavily in favor of reinstating maintenance to Cargill, we reverse the decision of the court of appeals, and direct the court of appeals to remand the case to the district court for further proceedings consistent with this opinion.

ERICKSON, J., dissents, and ROVIRA, C.J., and VOLLACK, J., join in the dissent.

---

**14.** We conclude that, unless otherwise provided in the separation agreement, maintenance payments are terminated when the spouse receiving such payments is remarried, whether that remarriage is ceremonial or at common law. If such a remarriage is annulled, then a court may determine whether the maintenance obligation should be reinstated and on what terms. Such determinations should be made on the facts and the equities of the particular case.

**15.** Rollins, in his brief, mentions that Cargill testified that, when she married Schwaab, she

believed that she was giving up her right to maintenance from Rollins. This is irrelevant. First, based on the facts as she knew them at the time, this belief was correct. She believed that her marriage to Schwaab was valid when she married him. She did not know the facts about which Schwaab was defrauding her at that time. Therefore, she really could not have responded in any other way. Second, Cargill's opinion about her legal rights is immaterial. It is a question of law for the court, not one of fact or opinion for the parties to decide.

**Justice ERICKSON dissenting:**

I respectfully dissent from the majority opinion reversing the decision of the court of appeals in *In re the Marriage of Cargill and Rollins*, 826 P.2d 387 (Colo.App.1991). I do not agree with the majority's interpretation of section 14–10–122(2), 6B C.R.S. (1987),[1] and disagree with the majority's conclusion that the General Assembly intended "remarriage" to mean the status of marriage. Maj. op. at 1339.

The majority's analysis conflicts with the clear legislative intent of section 14–10–104, 6B C.R.S. (1987), which states that "[t]his article shall be so applied and construed as to effectuate its general purpose to make uniform the law with respect to the subject of this article among those states which enact it." The majority ignores the established precedents in other jurisdictions that have adopted the same language of the Uniform Marriage and Divorce Act (the Uniform Act) § 316(b), 9A U.L.A. (1987 & 1992 Supp.), and have reached a contrary conclusion in interpreting the term "remarriage."

I would hold that the plain language of section 14–10–122(2) precludes the judicial reinstatement of Rollins' maintenance obligation to Cargill and that Rollins' maintenance obligation was not reinstated following the declaration of invalidity of Cargill's remarriage. It is a serious mistake to force trial courts to make an ad hoc determination in every case that involves a claim for reinstatement of a maintenance obligation imposed in a dissolution of marriage decree.

## I

Donald Rollins and Lucia Cargill signed a separation agreement in October 1985, in contemplation of divorce after thirteen years of marriage. The separation agreement required Rollins to pay "maintenance" for a period of six years to Cargill, but provided that "[m]aintenance shall terminate on the death or remarriage of the Wife."

In August 1988, Cargill voluntarily married Stefan Schwaab. She believed that the marriage was valid at the time of the ceremony. Following the marriage, Rollins discontinued the maintenance payments. In January 1989, the district court entered an order establishing child support for the three children in Cargill's custody at $1,800 per month. The district court's order did not address or provide for the resumption of maintenance to Cargill after her remarriage.

In December 1989, Cargill's remarriage was declared invalid in a dissolution of marriage proceeding in the Boulder County District Court.[2] She subsequently filed a separate motion to reinstate Rollins' maintenance obligation in the Larimer County District Court. The district court, after conducting a hearing and taking testimony, entered findings of fact and conclusions of law declaring that (1) Cargill's remarriage was invalid pursuant to section 14–10–111, 6B C.R.S. (1987), and was *void ab initio;* (2) *Torgan v. Torgan*, 159 Colo. 93, 410 P.2d 167 (1966), did not preclude reinstatement of maintenance because *Torgan* was decided before Colorado adopted the Uniform Dissolution of Marriage Act, sections 14–10–101 to –133, 6B C.R.S. (1987 & 1992 Supp.); (3) Cargill was entitled to maintenance pursuant to section 14–10–114, 6B C.R.S. (1987), when the dissolution of marriage decree was entered finalizing her divorce from Rollins; and (4) maintenance should be reinstated retroactive to the date of Cargill's remarriage.

The court of appeals reversed the judgment of the district court, concluding that a former maintenance obligation is not rein-

---

1. Section 14–10–122 provides "[u]nless otherwise agreed in writing or expressly provided in the decree, the obligation to pay future maintenance is terminated upon the death of either party or the remarriage of the party receiving maintenance."

2. Cargill's second marriage was declared invalid based on the fraud of Schwaab.

stated when a remarriage is declared invalid. *Cargill*, 826 P.2d at 388. The court of appeals determined that "unless the parties agree otherwise, under the plain language of § 14–10–122 a spouse's maintenance obligation terminates upon the remarriage of the payee and is not revived upon the annulment of that marriage." *Id.* at 389.

## II

We granted certiorari to decide whether the court of appeals erred in determining that the annulment of a second marriage by a decree of invalidity could not serve to reinstate maintenance received from a previous spouse.[3] I agree with the analysis of the court of appeals and the courts of other jurisdictions that have adopted the language of section 316(b) of the Uniform Act and would hold that Rollins' maintenance obligation was not reinstated following the declaration of invalidity of Cargill's remarriage. Accordingly, I would affirm the court of appeals.

## A

In order to address the question of whether the annulment of Cargill's remarriage by a decree of invalidity could serve to reinstate Rollins' maintenance obligation, section 14–10–122(2) and the previous statutory provision must be reviewed.

Prior to the adoption of section 14–10–122(2), the statutory provision governing termination of alimony provided:

> The remarriage of a party entitled to alimony, though such marriage be void or voidable, shall relieve the other party from further payments of said alimony; but nothing in this section shall preclude the parties from providing otherwise by written agreement or stipulation.

§ 46–1–5(5), 3 C.R.S. (repealed 1971).

In *Torgan*, based on section 46–1–5(5), we affirmed the trial court's conclusion that "the statutes of this state denied such right to restoration of alimony, whether or not the subsequent marriage was valid, void, or voidable." *Torgan*, 159 Colo. at 99, 410 P.2d at 170.[4] Under the clear language of section 46–1–5(5), a "remarriage" included all subsequent marriages, including void and voidable marriages.

In 1971, Colorado adopted the Uniform Dissolution of Marriage Act, sections 14–10–101 to –133, 6B C.R.S. (1987 & 1992 Supp.), substantially based on the Uniform Act as approved by the National Conference of Commissioners on Uniform State Laws in 1970.[5] With the adoption of the Uniform Dissolution of Marriage Act, the General Assembly eliminated alimony and enacted section 14–10–114(1), 6B C.R.S. (1987), to establish maintenance for either spouse in certain circumstances.[6]

---

3. I agree with the majority that the invalidation of a marriage by itself cannot ever serve to reinstate a maintenance obligation because the prior spouse is not a party to the annulment proceeding. I disagree with the majority, however, as to whether maintenance can be reinstated in a subsequent adversarial proceeding following the declaration of invalidity.

4. The court of appeals properly concluded that reinstatement of maintenance was not precluded by *Torgan* because it was decided prior to the adoption of the Uniform Dissolution of Marriage Act.

5. In addition to Colorado, seven states have adopted the Uniform Act: Arizona, Illinois, Kentucky, Minnesota, Missouri, Montana, and Washington. *See* Unif. Marriage and Divorce Act, 9A U.L.A. (1987 & 1992 Supp.). Of these states, only Colorado and Montana recognize common-law marriage.

6. Section 14–10–114(1)(a) and (b) provides:

> (1) In a proceeding for dissolution of marriage or legal separation or a proceeding for maintenance following dissolution of marriage by a court, the court may grant a maintenance order for either spouse only if it finds that the spouse seeking maintenance:
> (a) Lacks sufficient property including marital property, apportioned to him, to provide for his reasonable needs; and
> (b) Is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

Section 14–10–122(2) was enacted to provide for modification and termination of maintenance and provides that, "[u]nless otherwise agreed in writing or expressly provided in the decree, the obligation to pay future maintenance is terminated upon the death of either party or the remarriage of the party receiving maintenance." Section 14–10–122(2) is identical in all respects to section 316(b) of the Uniform Act. *See* Unif. Marriage and Divorce Act § 316(b), 9A U.L.A. (1987 & 1992 Supp.).

The majority holds that "the term remarriage, as used in section 14–10–122(2) must be construed to mean marital status, and not the ceremony of marriage." Maj. op. at 1342. The majority's holding, however, is not supported by either the legislative history of Colorado's Uniform Dissolution of Marriage Act or by the history of the Uniform Act.

## B

The majority's holding that remarriage means marital status cannot be reconciled with the position of the other states that have adopted the language of section 316(b) of the Uniform Act and is therefore contrary to the express rule of construction of section 14–10–104.

Uniform statutes are designed to bring consistency and uniformity to the law of the jurisdictions that adopt the statutory provisions. *See People's Finance & Thrift Co. v. Shaw–Leahy Co.*, 214 Cal. 108, 3

P.2d 1012, 1012 (1931) (stating that "it is useless to enact legislation having for its object the unification of our laws if the courts of the several states are to place different and opposite constructions as to the meaning of the laws thus enacted").

The General Assembly specifically recognized the goal of uniformity in section 14–10–104 which provides, "[t]his article shall be so applied and construed as to effectuate its general purpose to make uniform the law with respect to the subject of this article among those states which enact it." Section 14–10–104 instructs courts to implement the underlying purpose of uniformity.

The majority erroneously fails to apply the specific rule of construction enacted by the General Assembly. In fact, the majority does not even attempt to distinguish the pertinent case law from other jurisdictions that have adopted the statutory language in section 316(b) of the Uniform Act. *See American Family Mut. Ins. Co. v. Bowser*, 779 P.2d 1376, 1379 (Colo.App.1989) (finding that courts should refer to case law from other jurisdictions in construing a. uniform statutory provision); *Ohio Ins. Guar. Ass'n v. Simpson*, 1 Ohio App.3d 112, 439 N.E.2d 1257, 1258 (1981) (construing uniform laws necessarily involves consulting the decisions of other states because the objective is to provide uniformity).[7] In my view, the majority interprets section 14–10–122(2) in a contrary manner to the other jurisdictions that have adopted the same language of the Uniform Act.[8]

---

**7.** Rather than discussing case law from jurisdictions that have adopted the Uniform Act, the majority instead chooses to distinguish *Sefton v. Sefton*, 45 Cal.2d 872, 291 P.2d 439 (1955) and *Gaines v. Jacobsen*, 308 N.Y. 218, 124 N.E.2d 290 (1954), two dated decisions interpreting different statutory language. *See* maj. op. at 1340–42.

The majority finds *In re Marriage of Harris*, 203 Ill.App.3d 241, 148 Ill.Dec. 541, 560 N.E.2d 1138 (1990) and *Glass v. Glass*, 546 S.W.2d 738 (Mo.App.1977) "to be unconvincing, because these opinions are based upon antiquated legal conceptions about gender roles in marriage or upon other unwarranted assumptions." Maj. op. at 1341. In fact, both the Illinois and the Missouri decisions interpreted statutes that were

based on section 316(b) of the Uniform Act and were adopted subsequent to section 14–10–122(2).

**8.** I find the majority's decision to ignore section 14–10–104 particularly troublesome. The General Assembly specifically adopted section 14–10–104 so that courts would construe the statutory provisions of the Uniform Dissolution of Marriage Act in a similar fashion to other jurisdictions that adopted the Uniform Act, regardless of the number of other jurisdictions that adopted the Uniform Act.

In my view, the majority has usurped a legislative function by defining "remarriage" to mean marital status. We should not decide cases based on what we believe the law should

All jurisdictions that adopted the language of section 316(b) of the Uniform Act have interpreted the statutory provision as terminating maintenance on "remarriage." The *unanimous view* in the other jurisdictions that have adopted the language of section 316(b) is that "remarriage" refers to any subsequent marriage and not marital status. Moreover, *no case* has held that the statutory term "remarriage" means marital status, including *Peters v. Peters*, 214 N.W.2d 151 (Iowa 1974), *In re Marriage of Williams*, 208 Mont. 252, 677 P.2d 585 (1984), and *Ferguson v. Ferguson*, 564 P.2d 1380 (Utah 1977), which are relied upon by the majority.[9]

In both *In re Marriage of Harris*, 203 Ill.App.3d 241, 148 Ill.Dec. 541, 560 N.E.2d 1138 (1990) and *Glass v. Glass*, 546 S.W.2d 738 (Mo.App.1977), the interpretation of the word "remarriage" in a statutory section providing for the termination of maintenance based on section 316(b) of the Uniform Act was the issue to be resolved on appeal. Both courts specifically rejected arguments that remarriage meant marital status and instead held that a ceremonial marriage that was later declared invalid was a "remarriage." *Harris*, 148 Ill.Dec. at 544, 560 N.E.2d at 1141; *Glass*, 546 S.W.2d at 742. *See also Hodges v. Hodges*, 118 Ariz. 572, 578 P.2d 1001 (App.1978) (holding that an annulled marriage was a "remarriage" that terminated the mainte-

nance obligation). I agree with the analysis of the other jurisdictions that have concluded that a subsequent marriage that is later declared invalid is a remarriage.[10]

We should not adopt the analysis of other jurisdictions solely because the statutory language is the same, but absent persuasive reasons, we should defer to that analysis. *See Reeves v. Reeves*, 233 Cal.App.3d 651, 284 Cal.Rptr. 650, 653 (1991) (holding that in order to promote consistency, courts should ordinarily adopt the construction given uniform statutes by other jurisdictions unless the construction is manifestly erroneous); *Lake Motor Freight, Inc. v. Randy Trucking, Inc.*, 118 Ill.App.3d 626, 74 Ill.Dec. 192, 196, 455 N.E.2d 222, 226 (1983) (finding that courts should defer to decisions of other states and construe uniform laws in accord with construction given to same statutory language by other jurisdictions in order to further goal of uniformity); *State ex rel. Tri–City Constr. Co. v. Marsh*, 668 S.W.2d 148, 151 (Mo.App. 1984) (finding that uniform act should be construed as other states have construed it); *State v. J.P. Lamb Land Co.*, 359 N.W.2d 368, 369 (N.D.1984) (holding that uniform acts should be uniformly interpreted). In my view, the majority's analysis is not a convincing interpretation of section 14–10–122(2) and offers no persuasive reasons to adopt a contrary position to that of other jurisdictions.

---

be, but must interpret the law as enacted by the General Assembly.

If the General Assembly truly intends for section 14–10–122(2) to have a unique meaning that is contrary to the other jurisdictions that have adopted the Uniform Act, the General Assembly can so provide and amend the statute accordingly. However, to adopt the majority's interpretation constitutes nothing less than judicial legislation and I refuse to pursue such a course. *Schlessinger v. Schlessinger*, 796 P.2d 1385, 1389 (Colo.1990).

**9.** The majority's reliance upon *Peters, Williams* and *Ferguson* is misplaced because the statutory language at issue in those cases differs from Colorado's Uniform Marriage and Dissolution Act. *See infra* section D.

**10.** In Colorado, the two ways a person can marry or remarry are by fulfilling the statutory

requirements set forth in section 14–2–102 to –113, 6B C.R.S. (1987 & 1992 Supp.), or by satisfying the requirements for a common law marriage. *See People v. Lucero*, 747 P.2d 660, 663 (Colo.1987) (holding that a common law marriage requires the mutual consent or agreement of the parties to be husband and wife, followed by a mutual and open assumption of a marital relationship). Defining "remarriage" in accord with its common meaning of a subsequent marriage encompasses both forms of marriage.

The majority implicitly concludes that a subsequent marriage that is later declared invalid is a "remarriage" that terminates maintenance payments. *See* maj. op. at 1343 n. 14 ("maintenance payments are terminated when the spouse receiving such payments is remarried, whether that remarriage is ceremonial or at common law").

### C

There are compelling reasons to adopt the analysis of the courts that have interpreted the same statutory language. The primary function of a court in interpreting and construing statutes is to ascertain and give effect to the intent of the General Assembly. *Colorado State Bd. of Medical Examiners v. Saddoris,* 825 P.2d 39, 42 (Colo.1992); *Farmers Group, Inc. v. Williams,* 805 P.2d 419, 422 (Colo.1991). To determine legislative intent, courts look first to the plain language of the statute. *Farmers Group,* 805 P.2d at 422; *People v. Terry,* 791 P.2d 374, 376 (Colo.1990). Words and phrases should be given effect according to their plain and ordinary meaning and courts should not strain to give language a contrary meaning unless the result is absurd. *Colorado Dep't of Social Services v. Board of County Comm'rs,* 697 P.2d 1, 18 (Colo.1985).

Section 14–10–122(2) applies unless the parties "otherwise agree" in writing. If the parties desired to avoid application of section 14–10–122(2), they could have included a provision limiting the termination of maintenance. *See, e.g., In re Marriage of Hahn,* 628 P.2d 175, 176 (Colo.App.1981) (finding that remarriage of wife did not terminate maintenance because language of separation agreement indicated that "it was the contemplation of the parties that only the wife's death would absolve the husband of liability for payment of maintenance"). Because the parties failed to "otherwise agree" as to the termination of maintenance, section 14–10–122(2) is applicable to this case.

The plain language of section 14–10–122(2) provides that maintenance obligations terminate upon "remarriage." Section 14–10–122(2), however, does not provide for the reinstatement or revival of maintenance if a marriage is subsequently declared invalid.[11] Thus, section 14–10–122(2) has only two possible readings in a situation where a subsequent marriage is declared invalid: (1) either maintenance is terminated because the subsequent marriage that is declared invalid is a "remarriage"; or (2) the subsequent marriage that is declared invalid is not a "remarriage" and the former spouse's obligation to provide maintenance was never terminated. The statutory language of section 14–10–122(2) does not provide any support for the judicial reinstatement or revival of the maintenance or for "an equitable middle path." *See* maj. op. at 1342.

The critical question is whether a subsequent marriage that is declared invalid is a "remarriage" within the meaning of section 14–10–122(2). It is axiomatic that statutory terms should be given their commonly accepted and understood meanings and that the commonly accepted and understood meaning is preferred over a strained or forced interpretation. *Triad Painting Co. v. Blair,* 812 P.2d 638, 644 (Colo.1991); *M.S. v. People,* 812 P.2d 632, 636 (Colo. 1991). The analysis of the courts that have addressed the issue in a statutory context is that "remarriage" means a subsequent marriage.[12]

Interpreting "remarriage" based on the common and ordinary meaning of a subse-

---

**11.** Nor does the comment to section 316(b) of the Uniform Act suggest that a trial court has the power or the ability to reinstate maintenance that has been terminated following a declaration of invalidity. Rather, the comment provides:

> Subsection (b) authorizes the parties to agree in writing or the court to provide in the decree that maintenance will continue beyond the death of the obligor or the remarriage of the obligee. In the absence of such an agreement or provision in the decree, this section sets the termination date for the obligations to pay future maintenance.

Unif. Marriage and Divorce Act § 316(b) cmt. b, 9A U.L.A. (1987).

**12.** Numerous other courts have similarly concluded that the plain and common meaning of the term "remarriage" is a subsequent marriage in the context of a separation agreement. *See, e.g., R.L.G. v. J.G.,* 387 A.2d 200, 203 (Del.Fam. Ct.1977); *In re Marriage of Kolb,* 99 Ill.App.3d 895, 55 Ill.Dec. 128, 133, 425 N.E.2d 1301, 1306 (1981); *Lehmann v. Lehmann,* 225 Ill.App. 513 (1922); *Dodd v. Dodd,* 210 Kan. 50, 499 P.2d 518, 523 (1972); *Chavez v. Chavez,* 82 N.M. 624, 485 P.2d 735, 737 (1971); *Gaines v. Jacobsen,* 308 N.Y. 218, 124 N.E.2d 290, 293 (1954).

quent marriage provides certainty and finality and allows both parties to lead their lives accordingly. On the other hand, defining remarriage to mean marital status necessarily means that all maintenance obligations are subject to modification or reinstatement at any point in the future on an ad hoc basis.

When the statutory language is clear and unambiguous, there is no need to resort to other interpretive rules of statutory construction and a court must apply the words according to their commonly accepted and understood meaning. *Woodsmall v. Regional Transp. Dist.*, 800 P.2d 63, 67 (Colo. 1990).[13] I would hold that, under the plain language of section 14–10–122(2), Cargill's subsequent marriage to Schwaab terminated Rollins' maintenance obligation.

## D

In my view, there is no statutory basis to judicially reinstate or revive a terminated maintenance obligation. Section 14–10–111(5) does not alter the analysis. The fact that a subsequent marriage is declared invalid for the purposes of section 14–10–111 does not affect the analysis of the term "remarriage" in section 14–10–122(2). The language of section 14–10–111(5) does not provide for the judicial reinstatement or revival of maintenance.

The majority concludes that a trial court may reinstate a maintenance obligation de-

pending on the facts and the equities of the situation, without ever explaining the statutory basis for this conclusion. *See* maj. op. at 1336, 1338. The majority relies primarily upon *In re Marriage of Williams*, 208 Mont. 252, 677 P.2d 585 (1984), to support this "equitable middle path." [14] In my view, this reliance is misplaced because the General Assembly specifically decided that a trial court would not have a role in determining whether the dissolution of divorce decree should be retroactive.

In *Williams*, the Montana Supreme Court reversed the trial court's decision reinstating an obligation to pay maintenance to a former spouse. *Id.*, at 587. However, the *Williams* court did not interpret the statutory section providing for the termination of maintenance. Instead, the decision was based on section 40–1–402(5) of the Montana statutes which provides:

> The court shall declare the marriage invalid as of the date of the marriage *unless the court finds, after a consideration of all relevant circumstances, including the effect of a retroactive decree on third parties, that the interests of justice would be served by making the decree nonretroactive.*

Mont.Code Ann. § 40–1–402(5) (1991) (emphasis added).

The language of section 40–1–402(5) of the Montana statutes is taken from section

---

**13.** If the statutory language is ambiguous or unclear, a court, in analyzing the intent of the General Assembly, may look at the entire statute and consider not only its language, but also the reason and necessity of the law, and the objective that the statute sought to accomplish. *Colorado Civil Rights Comm'n v. North Washington Fire Protection Dist.*, 772 P.2d 70, 78 (Colo.1989).

Because I find the statutory language to be clear and unambiguous, I do not resort to other maxims of statutory construction. I agree, however, with the court of appeals that the following factors buttress the conclusion that any subsequent marriage, regardless of whether it is declared invalid, terminates the obligation of the "first spouse" to provide maintenance to the "former spouse" under section 14–10–122(2): (1) the first spouse should have the right to rely upon the apparent remarriage of the former spouse; (2) as between successive spouses, the former spouse should look to the last one for

support; (3) the former spouse should not be given either two sources of support or the ability to chose between the first and the second spouse for the most profitable; (4) as between the first spouse and the former spouse, the former spouse should bear the consequences of the events that the former spouse brought on. *In re the Marriage of Cargill and Rollins*, 826 P.2d 387, 389 (Colo.App.1991).

**14.** The majority also cites to *Peters v. Peters*, 214 N.W.2d 151 (Iowa 1974) and *Ferguson v. Ferguson*, 564 P.2d 1380 (Utah 1977) in support of its conclusion that a trial court can look at the facts and equities of each case. However, these cases are of little value because neither Utah nor Iowa has adopted the Uniform Act. The statutory provisions at issue in *Peters* and *Ferguson* therefore differ significantly and provide little guidance.

208(e) of the Uniform Act. *See* Unif. Marriage and Divorce Act § 208(e), 9A U.L.A. (1987 & 1992 Supp.). Based on this statutory provision, the Montana Supreme Court remanded the case to the trial court because there was "no evidence in this record that the District Court considered any possible effect of a retroactive decree on third parties before granting the decree and declaring it to be retroactive." *Williams*, 677 P.2d at 586.

The majority's misplaced reliance on *Williams* highlights the flaws in its statutory analysis. Unlike Montana, the General Assembly did not adopt the language of section 208(e) of the Uniform Act to allow a trial court to consider the effect of a decree on third parties or to make a decree retroactive.[15] The majority nevertheless uses the comment to section 208(e) as the sole support for its conclusion that a trial court "can and should determine whether the annulment is binding against the payor spouse." Maj. op. at 1341 n. 12. Instead, the General Assembly enacted section 14–10–111(5) which provides that "[m]arriages declared invalid under this section shall be so declared as of the date of the marriage."

The enactment of statutory language based on section 208(e) of the Uniform Act, rather than section 14–10–111(5), would provide some statutory support for the majority's holding that a trial court could reinstate a maintenance obligation, "depending on the facts and the equities of the situation." Maj. op. at 1336. However, the specific adoption of different language in section 14–10–111(5) is fatal to the majority's analysis.

Because section 14–10–111(5) does not provide a trial court with discretion to determine whether a decree of invalidity is retroactive, it logically eliminates an equitable middle ground by declaring a subsequent marriage invalid as of the date of the marriage. There is no statutory basis for a trial court to determine whether the decree is retroactive, as the trial court specifically concluded in this case, and which the majority approves.

Section 14–10–111(5) is not designed to affect the rights and obligations of the parties to a prior marriage or to provide for the reinstatement of a terminated maintenance obligation. Instead, section 14–10–111(5) establishes the framework by which a marriage can be declared invalid. Section 14–10–111(5) does not eliminate the fact that a marriage existed or that a marriage occurred whether by ceremony or by satisfying the common-law requirements. For these reasons, section 14–10–111(5) provides no statutory basis for the judicial reinstatement or revival of a terminated maintenance obligation.[16]

### E

In my view, the change in the statutory language of section 14–10–122(2) from section 46–1–5(5) does not alter the analysis or cause a different result from *Torgan*. The General Assembly eliminated the distinction between void and voidable marriages with the enactment of section 14–10–111. As a result, there was no need for the qualifying "void or voidable" language in section 14–10–122(2). However, there is no indication that the General Assembly intended to overrule the result mandated by *Torgan* or that the term "remarriage" was

---

**15.** I do not agree with the majority's conclusion that the General Assembly's specific decision to adopt different language from section 208(e) of the Uniform Act is "immaterial," particularly because the only issue in *Williams* was the interpretation of the language in section 208(e).

**16.** In fact, section 14–10–111(6), 6B C.R.S. (1987) allows a court to award maintenance to a spouse upon a declaration of invalidity and thereby ameliorates the potentially harsh results following the termination of maintenance from the first marriage. The General Assembly specifically provided an alternative means of support in section 14–10–111(6), if needed and available, to mitigate the effect of the termination of maintenance pursuant to the express terms of section 14–10–122(2).

The majority's belief that Cargill would have been unable to receive maintenance from Schwaab pursuant to section 14–10–111(6) is not supported by the record, which only indicates that Cargill signed an agreement waiving any maintenance from Schwaab.

used in a different manner in section 14–10–122(2) than it had been used in section 46–1–5(5).

I would reaffirm *Torgan* and hold that the term "remarriage" in section 14–10–122(2) refers to any subsequent marriage, regardless of whether that marriage is void, voidable, valid, or invalid. Accordingly, Cargill's subsequent marriage terminated Rollins' maintenance obligation as a matter of law and the maintenance obligation was not reinstated or revived following the declaration of invalidity.

### III

Accordingly, I would affirm the judgment of the court of appeals.

I am authorized to say that Chief Justice ROVIRA and Justice VOLLACK join in this dissent.